1  **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8

9   Todd Lee Smith,                      ) No. CV-03-1810-PHX-SRB
                                         )
10            Petitioner,                ) <u>DEATH PENALTY CASE</u>
                                         )
11  v.                                   )
                                         ) **MEMORANDUM OF DECISION**
12                                       ) **AND ORDER**
    Charles L. Ryan, et al.,[1]          )
13                                       )
              Respondents.               )
14                                       )
                                         )
15  _____     )

16        Petitioner Todd Lee Smith, a state prisoner under sentence of death, has filed an

17  Amended Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced

18  in violation of the United States Constitution.  (Dkt. 24.)[2]  The petition raises 20 claims for

19  relief.  In a prior order, the Court denied Petitioner's motion for evidentiary development and

20  dismissed in whole or in part eight of Petitioner's claims.  (Dkt. 64.)  This order addresses

21  the remaining claims and concludes, for the reasons set forth herein, that Petitioner is not

22  entitled to habeas relief.

23                    **FACTUAL AND PROCEDURAL BACKGROUND**

24        In 1997, a jury convicted Petitioner of two counts of first-degree murder, armed

25

26  _____

27        [1]   Charles L. Ryan, Interim Director of the Arizona Department of Corrections, is
    substituted for his predecessor pursuant to Fed. R. Civ. P. 25(d)(1).

28        [2]   "Dkt." refers to the documents in this Court's case file.

robbery, and first-degree burglary arising from the robbery and deaths of Joe and Elaine Tannehill at a campground in Ashurst Lake, Arizona. The Arizona Supreme Court summarized the facts as follows:

> During the summer of 1995, Clarence "Joe" Tannehill, 72, and Elaine, his 73-year-old wife, were camping near Ashurst Lake, approximately twenty miles from Flagstaff. They arrived at the campsite in their truck and travel trailer on July 26, 1995.
>
> Todd Lee Smith arrived at the Ashurst campground on July 21, 1995 with his mother, Judy Smith, and four-year-old son in a motor home and car. The three were living in the motor home. Smith had been unemployed for some time and Judy supported all three with her Social Security income.
>
> On July 31, 1995, after a quarrel, the Smiths left Ashurst separately. Later that same day, Todd Smith and his son returned to Ashurst in the motor home. He had no money. When he arrived, he checked in and gave the campground hosts the name "Tom Steel" and an incorrect license plate number.
>
> The next evening, August 1, Smith went to the Tannehills' trailer armed with a gun and knife. His hand was wrapped in his son's T-shirt to feign an injury as a ruse to get into the trailer. Once Smith was inside, Mr. Tannehill grabbed for the gun and it went off. Smith then struck the Tannehills repeatedly with the gun. Although both had already died from blunt-force head injuries, he also cut their throats. Mrs. Tannehill also had bruises and lacerations on her arms and upper body, which the medical examiner characterized as defensive wounds.
>
> Smith took Mr. Tannehill's wallet from his back pocket and emptied Mrs. Tannehill's purse on the bed. He took cash, but left credit cards. He also took a white television set, seven necklaces, and approximately $130. Smith said he struck them first, took the items, and when he thought they were getting up, struck them again and slit their throats.
>
> The Tannehills' bodies were not discovered until August 3, 1995, when neighboring campers grew concerned over not having seen the Tannehills for a couple of days. By this time, Smith and his son had gone to Phoenix and were staying with friends.
>
> When Smith arrived in Phoenix on the morning of August 2, he told his friends he had just come from Louisiana. Smith asked one of his friends to sell a pearl necklace for him, which he said had belonged to his grandmother. Smith stayed with these friends and parked his motor home behind a gas station. After Smith saw his picture on the news in connection with the Tannehill murders, he removed the license plate from the motor home. He was also seen leaving the motor home with a green trash bag, which police later recovered in a nearby dumpster. The bag contained a bloodstained handgun and knife, and bloody clothing. Both Tannehills' blood was on the gun and clothing, Mr. Tannehill's blood was on the knife, and Smith's blood was also on the clothing. After obtaining a search warrant for the motor home, the police discovered the Tannehills' television set and six necklaces.

*State v. Smith*, 193 Ariz. 452, 455-56, 974 P.2d 431, 434-35 (1999).

After finding four aggravating factors and no mitigating circumstances sufficiently substantial to call for leniency, Coconino County Superior Court Judge H. Jeffrey Coker sentenced Petitioner to death for the murders and to a term of imprisonment for the other counts. On direct appeal, the Arizona Supreme Court affirmed. *Smith*, 193 Ariz. 452, 974 P.2d 431. The United States Supreme Court denied certiorari. *Smith v. Arizona*, 528 U.S. 880 (1999).

Petitioner filed a petition for post-conviction relief ("PCR") pursuant to Rule 32 of the Arizona Rules of Criminal Procedure on February 2, 2002. Without holding an evidentiary hearing, the PCR court denied relief. On September 9, 2003, the Arizona Supreme Court summarily denied a petition for review. Thereafter, Petitioner initiated the instant habeas proceedings.

In an order filed March 21, 2006, this Court determined that Petitioner was not entitled to discovery, expansion of the record, or an evidentiary hearing on numerous claims. The Court found that Petitioner had failed to act diligently to develop the facts in state court and that some of the claims either involved a pure question of law or were resolvable based on the existing record. (Dkt. 64 at 37-45.) The Court also denied Claims 1 (in part), 3 (in part), 5 (in part), 14, 15, 16, 18, and 20 as procedurally barred, non-cognizable, or meritless. (*Id.* at 13-29.)

## APPLICABLE LAW

Because it was filed after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA). *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Woodford v. Garceau*, 538 U.S. 202, 210 (2003). The following provisions of the AEDPA will guide the Court's consideration of Petitioner's claims.

### Principles of Exhaustion and Procedural Default

Under the AEDPA, a writ of habeas corpus cannot be granted unless it appears that the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see*

3

*also Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982). To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

A claim is "fairly presented" if the petitioner has described the operative facts and the federal legal theory on which his claim is based so that the state courts have a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). Unless the petitioner clearly alerts the state court that he is alleging a specific federal constitutional violation, he has not fairly presented the claim. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004). A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and post-conviction relief proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, a claim may be procedurally defaulted if the petitioner failed to present

it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

Ordinarily, "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id*. at 753. Objective factors which constitute cause include interference by officials which makes compliance with the state's procedural rule impracticable, a showing that the factual or legal basis for a claim was not reasonably available to counsel, and constitutionally ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). "Prejudice" is actual harm resulting from the alleged constitutional error or violation. *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). To establish prejudice resulting from a procedural default, a habeas petitioner bears the burden of showing not merely that the errors at his trial constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension. *United States v. Frady*, 456 U.S. 152, 170 (1982).

**Standard for Habeas Relief**

The AEDPA established a "substantially higher threshold for habeas relief" with the

"acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 127 S. Ct. 1933, 1940 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [a petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 76 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 549 U.S. at 77; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent

may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004).

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340;

*see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240.

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.

## DISCUSSION

**Claim 6:       Petitioner's Statements to Police**[3]

Petitioner contends that his statements to police were obtained in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments and should not have been admitted at trial. (Dkt. 24 at 240-309.) Respondents acknowledge that these allegations were properly exhausted on direct appeal. (Dkt. 32 at 60.)

Relevant Facts

Petitioner was arrested at a Denny's restaurant in Phoenix at approximately 4:40 a.m. the morning of August 6, 1995. (RT 5/29/96 at 20.)[4] None of the Phoenix officers involved

---

[3]    Because Petitioner's statements are relevant to the analysis of several of his other claims, the Court addresses this claim first.

[4]    "RT" refers to the reporter's transcript. "ROA" refers to the consecutively-numbered documents filed in the three-volume record on appeal prepared for Petitioner's direct appeal (Arizona Supreme Court Case No. CR-97-0389-AP). "ME" refers to the one-volume set of consecutively-numbered minute entries from Petitioner's trial and sentencing

8

in his arrest provided him with *Miranda* warnings. (*Id.* at 28, 66, 92-93, 111-12, 129.) In the parking lot of the restaurant, Officer James Maish questioned Petitioner about his shirt, asking where he had put the one he was previously wearing. (*Id.* at 95-96, 126.) Petitioner was then transported to the Phoenix Police Department and held until the arrival of investigating detectives from the Coconino County Sheriff's Department.

While waiting, Petitioner engaged in small talk with Phoenix police officers. (*Id.* at 26-27, 128-29.) To Officer Maish Petitioner volunteered that methamphetamine and alcohol had ruined his marriage. (*Id.* at 147.) This led Maish to question whether it was okay for Petitioner's ex-wife to use methamphetamine when she was with their son, Patrick. (*Id.*) Petitioner responded, "Of course, not," and Maish remarked that Petitioner looked pale and sick for his age and that "the only way a 34-year-old man could look like that is if he was sick or using drugs." (*Id.* at 147-48.) This prompted Petitioner to discuss his own methamphetamine use two days earlier; he then pulled a small bag containing the drug from the watch pocket of his pants. (*Id.* at 131, 134, 148.) Petitioner continued to make comments and asked about his motor home, eventually stating that he had removed the motor home's license plates after seeing a TV news report about himself. (*Id.* at 136, 148.) Petitioner asked Maish when the Flagstaff detectives would be arriving and then stated, "Patrick likes the motor home. It was Patrick who first went to the old folks' motor home. He got to know them first and that's when I got to meet them through Patrick." (*Id.* at 137.) Officer Maish testified at a pretrial evidentiary hearing that while sitting with Petitioner at the police station he "never had any intention or desire" to question him about the investigation and that he in fact did not question him. (*Id.*; *see also id.* at 129-30.) Petitioner also testified at this hearing, but neither party asked him any questions regarding his conversation with Officer

---

proceedings prepared for Petitioner's direct appeal. "PCR-ROA" refers to the consecutively-numbered documents in the three-volume record on appeal prepared for Petitioner's petition for review to the Arizona Supreme from the denial of PCR relief (Arizona Supreme Court Case No. CR-03-0039-PC). Certified copies of these records as well as the original trial transcripts were provided to this Court by the Arizona Supreme Court. (Dkt. 50.)

Maish.  (*See* RT 5/31/96 at 137-81.)

After arriving at the Phoenix police station, Coconino County Sheriff Detective Michael Rice initiated a videotaped interrogation at 9:10 a.m. and explained to Petitioner his rights under *Miranda*.  (PCR-ROA 23, Ex. B, PPD Interview at 2.)  Petitioner waived his rights, stating "I've got no problem talking to you." (*Id.*)  Petitioner acknowledged camping in the same area where the couple had been killed and said he had met them when his dog ran into their trailer and he went to retrieve it.  (*Id.* at 7.)  At some point, Petitioner asked the detective if he thought Petitioner had killed them; Rice said, "Yeah." (*Id.* at 19.)  Petitioner responded, "Well, I guess I need a lawyer then, don't I?" (*Id.*)  Rice stated, "Well, that's up to you – that's something that you have to decide." (*Id.*)  Detective Rice then told Petitioner that investigators had found a bag containing the bloody weapons and clothes Petitioner had dumped.  Petitioner unequivocally invoked his right to an attorney, and the interrogation ended approximately 17 minutes after it had started.  (*Id.* at 19-23; RT 5/29/96 at 172.)

Less than an hour later, as Detective Rice stood next to Petitioner while preparing to transport him to Flagstaff, Petitioner said, "I don't see why I shouldn't just tell you."  (RT 5/29/96 at 188.)  At the suppression hearing, Detective Rice testified that this statement was unsolicited; Petitioner testified that he had no recollection of making it.  (*Id.* at 188-89; RT 5/31/96 at 155-57.)  Detective Rice wrote Petitioner's statement into his notebook and then conversed privately with another detective about setting up a tape recorder in the vehicle. (RT 5/29/96 at 191-92.)  Once in the car, the following exchange took place:

MR:   . . . Todd – you made a comment when we got downstairs to – to get in the car – you just – you – and I want – I want to clarify what you're – what you're saying – because you made a comment [to] me – you said you don't know why you shouldn't just tell me.

TS:   Yeah.

MR:   What do you mean by that?  Did you – are you...

TS:   Bein' – is this being recorded?

MR:   Yeah – is that all right?

TS:   It's just – yeah, it's all right.  But –

| | | |
|---|---|---|
| 1 | MR: | Do you want to talk to me? |
| 2 | TS: | You see, I want to... |
| 3 | MR: | Is that what you're saying? |
| 4 | TS: | ...I want to talk to you, but I – yeah, in the car's a little ridiculous on the way up there – uh – there's – there's – there's no need to – for me to – yeah, I'll talk to you. |
| 5 | | |
| 6 | MR: | You... |
| 7 | TS: | I – I'd rather not talk to you right this minute... |
| 8 | MR: | OK. |
| 9 | TS: | Uh – since... |
| 10 | MR: | You want to wait? |
| 11 | TS: | ...since I've been in town I've been doing drugs and – and I don't... |
| 12 | MR: | OK. |
| 13 | TS: | ...really want to – want to... |
| 14 | MR: | Would you rather wait 'til we get to Flagstaff? |
| 15 | TS: | Yeah (sighs). |
| 16 | MR: | All right. |
| 17 | TS: | Or at least – (inaudible) longer than this – longer than right now. |
| 18 | MR: | Sure – that's fine.  OK – well, I just want you to think about it – if you're – if you...really want to talk to me, that's great. |
| 19 | | |
| 20 | TS: | Well, there's no real secret to it anyway. |
| 21 | | . . . . |
| 22 | TS: | It's going to be pretty public and sensational isn't it?  The whole thing. |
| 23 | MR: | The whole thing? |
| 24 | TS: | Yeah. |
| 25 | MR: | Yeah. |
| 26 | TS: | Yeah, that's what I figured. |
| 27 | MR: | In all honesty it is. |
| 28 | | (Pause – vehicle motor noise) |

11

| | |
|---|---|
| 1 | **TS:** My son was asleep by the way in the motor home. His shirt – yeah, the – the shirt was wrapped around my hand – I made it look as though I cut myself. |
| 2 | |
| 3 | **MR:** To make it look like you cut yourself? |
| 4 | **TS:** Yeah. Who knows – I might be insane, but I'm not crazy. |
| 5 | **MR:** Why – why would you want to make it look like your cut yourself? |
| 6 | **TS:** Probably to get in the door. |

(PCR-ROA 23, Ex. B, Vehicle Interview at 1-4.) At some point later during the drive,

Petitioner volunteered, "Anything you want to know – uh – ask any questions, go ahead –

or just want me to talk about..." (*Id.* at 27.) He then admitted taking the Tannehills' TV,

some necklaces, a wallet, and cash, and hitting the victims with the barrel of his gun. (*Id.* at

28-29.)

The final interrogation began at the Coconino County Sheriff's Office in Flagstaff at

1:00 p.m. (PCR-ROA 23, Ex. B, CCSO Interview at 1.) At the start, Detective Rice again

clarified that Petitioner indicated a desire to talk:

| | |
|---|---|
| **MR:** | OK – Todd, I want to – I want to – uh – you know – give you the opportunity to talk now 'cuz you kind of indicated to me down there when we started to get in the car that you... |
| **TS:** | Yeah. |
| **MR:** | ...wanted to go ahead and talk – you know – you un...uh – we need to kind of clarify – you understand that you had invoked your rights at the office – and so I couldn't come to you. Is...is it correct that you came to me – or – basically by saying you want to talk? |
| **TS:** | Yeah. |

(*Id.* at 2.) Petitioner then recalled the events that took place in the Tannehills' trailer: he had

wrapped his son's shirt in his hand to simulate an injury in order to gain entry into the trailer;

once inside he pulled a gun and demanded money; Mrs. Tannehill screamed and Mr.

Tannehill fought with him; the gun went off and Petitioner hit Mr. Tannehill; he cut them

with the knife after "they woke up." (*Id.* at 2-8.) Petitioner again described the items he had

stolen and said he had not taken any drugs prior to the offense, but did so after he went to

Phoenix. (*Id.* at 4-5.) He claimed he had not slept since the night of the killings (five days

earlier) and had been taking methamphetamine and drinking alcohol in the days preceding his arrest. (*Id.* at 16-17.)

Prior to trial, the State moved for a voluntariness hearing and Petitioner moved to suppress admission of his statements. (ROA 13, 34.) Petitioner argued that his Fifth Amendment rights had been violated and that the statements were involuntary as a result of coercive police tactics and his emotional, physical, and mental condition, including being under the influence of methamphetamine and lack of sleep. (ROA 34 at 2.) He further argued that the statements were secured in violation of the Sixth Amendment because the police reinitiated interrogation after Petitioner had invoked his right to counsel. (*Id.*) In a supplemental motion to suppress, Petitioner argued that Officer Maish had purposefully interrogated him at the Phoenix police station without first explaining his *Miranda* rights, and, therefore, his comments to Maish as well as each of the subsequent recorded statements to Detective Rice were tainted. (ROA 114.)

Following a four-day evidentiary hearing, the trial court denied the first motion to suppress except for Petitioner's statements prior to arriving at the Phoenix police station. (ME 11/4/96.) As to the supplemental motion, the court ruled that Petitioner's statements to Officer Maish "were voluntarily given and not as a result of police interrogation or coercion. The statements made by Officer Maish were generally in response to questions asked by Defendant and were not made by the officer with the expectation that they would lead to incriminating statements from the Defendant." (ME 3/29/97 at 2.)

Sixth Amendment Analysis

The Sixth Amendment "right to counsel attaches only when formal judicial proceedings are initiated against an individual by way of indictment, information, arraignment, or preliminary hearing." *United States v. Gouveia*, 467 U.S. 180, 185 (1984) (citing *Kirby v. Illinois*, 406 U.S. 682, 688 (1972)); *see Illinois v. Perkins*, 496 U.S. 292, 299 (1990); *Moran v. Burbine*, 475 U.S. 412, 428-31 (1986); *United States v. Hayes*, 231 F.3d 663, 673 n.4 (9th Cir. 2000) (collecting cases). "[O]nce formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case-in-chief statements

13

'deliberately elicited' from a defendant without an express waiver of the right to counsel." *Michigan v. Harvey*, 494 U.S. 344, 348 (1990) (citing *Massiah v. United States*, 377 U.S. 201, 206 (1964)). According to the "deliberate-elicitation" standard, "the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent"; it "is not violated whenever – by luck or happenstance – the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton*, 474 U.S. 159, 176 (1985); *see Beaty v. Stewart*, 303 F.3d 975, 991 (9th Cir. 2002) ("the Sixth Amendment is violated only by deliberate action").

The Arizona Supreme Court addressed Petitioner's Sixth Amendment claim on direct appeal:

> Smith appears to assert that his right to counsel was violated when the police questioned him without a lawyer because judicial proceedings had been initiated against him. He does not argue this point, but merely states, "It should also be noted that a complaint had been filed against Appellant prior to his arrest. The filing of the complaint entitled Appellant to the appointment of counsel." Appellant's Opening Br. at 8.

> We need not decide whether the filing of a complaint initiates adversary judicial proceedings. *See* Ariz. R. Crim. P. 2.2. Even if Smith was entitled to counsel, he waived the right after receiving *Miranda* warnings and, thus, his statements to Detective Rice are admissible.

> After the Sixth Amendment right to counsel attaches, the accused can waive this right and speak to police without counsel present. *Patterson v. Illinois,* 487 U.S. 285, 108 S. Ct. 2389 (1988) (holding statements from post-indictment questioning without counsel admissible, and rejecting the argument that the Sixth Amendment right to counsel prohibits the police from initiating questioning even if the accused did not request counsel). If the accused has been given his *Miranda* warnings and makes a voluntary, knowing, and intelligent waiver of those rights, the statements are admissible. *Id.* at 292-94, 108 S. Ct. at 2394-96. However, when the police initiate questioning, a waiver of the right to counsel is only valid if the accused has not yet asked for a lawyer. *Id.* at 291, 108 S. Ct. at 2394. The analysis, therefore, mirrors the *Miranda* analysis we have already done.

> When a suspect invokes his right to a lawyer, all questioning must cease. *Edwards v. Arizona,* 451 U.S. 477, 481, 101 S. Ct. 1880, 1883 (1981). However, if the suspect reinitiates contact with the police, he waives his rights and questioning can continue. *Oregon v. Bradshaw,* 462 U.S. 1039, 1043-44, 103 S. Ct. 2830, 2833-34 (1983); *see also Edwards,* 451 U.S. at 484-85, 101 S. Ct. at 1884-85. In the Sixth Amendment context, the *Edwards* analysis applies – after the accused requests counsel, a subsequent waiver must not be based on police-initiated questioning, but must be defendant-initiated.

*Michigan v. Jackson,* 475 U.S. 625, 635-36, 106 S. Ct. 1404, 1410-11 (1986) (holding postarraignment questioning of an accused who requested counsel at the arraignment invalid). Furthermore, once the suspect has waived his rights, he is always free to re-invoke them.

In this case, Smith was given the *Miranda* warnings by Detective Rice before he was questioned. Smith said, "I've – I've got no problem talking to you." State Ex. 171, Det. Rice Interview at Phoenix Police Station at 2. Thus, Smith initially waived his rights. After Smith was confronted with incriminating evidence during questioning, he stated, "I want a lawyer – I – I need a lawyer I guess – if you guys think I did this, I need a lawyer." *Id.* at 20. Smith was aware of his rights, as evidenced by his invoking them during the interrogation. Questioning ceased when Smith stated unequivocally his desire for a lawyer. Smith then waived his right to a lawyer when he reinitiated contact with the statement, "I don't see why I shouldn't just tell you." Tr. Apr. 15, 1997 at 149. There was no Sixth Amendment violation. Smith's statements to Detective Rice are admissible.

In addition, Smith's statements to Officer Maish, made before he received his *Miranda* warnings, are admissible even if his Sixth Amendment right to counsel had attached. "'[T]he Sixth Amendment is not violated whenever – by luck or happenstance – the State obtains incriminating statements from the accused after the right to counsel has attached.'" *Kuhlmann v. Wilson,* 477 U.S. 436, 459, 106 S. Ct. 2616, 2630 (1986) (quoting *Maine v. Moulton,* 474 U.S. 159, 176, 106 S. Ct. 477, 487 (1985)). *Kuhlmann* held that the Sixth Amendment did not forbid admitting postarraignment statements made to a jailhouse informant who did not question or otherwise deliberately elicit information from the defendant. *Id.* The defendant's statements were "spontaneous" and "unsolicited." *Id.* at 460, 106 S. Ct. at 2630.

For the same reason that the admission of Smith's statements to Officer Maish did not violate *Miranda,* it did not violate the Sixth Amendment. Officer Maish did not interrogate Smith, nor did he use any tactics designed to elicit information. Smith's statements to Officer Maish were unsolicited. He engaged in casual conversation with Officer Maish and incriminated himself in the process. His statements to Officer Maish are also admissible.

*Smith*, 193 Ariz. at 459-60, 974 P.2d at 438-39.

Petitioner asserts that his right to counsel under the Sixth Amendment was violated in two respects: when Officer Maish elicited statements from Petitioner at the Phoenix Police Department and when Detective Rice continued questioning Petitioner while en route to Flagstaff after Petitioner had expressly requested an attorney. (Dkt. 24 at 263.)

*Statements to Officer Maish*

There is no dispute that Petitioner did not intentionally relinquish his right to counsel

during the several hours he waited with Officer Maish at the Phoenix Police Department.[5] Thus, the only question is whether Maish "deliberately elicited" Petitioner's incriminating statements. *Massiah*, 377 U.S. at 206. The trial court found that Maish's comments were in response to Petitioner's questions and were not made with the expectation they would lead to incriminating statements. (ME 3/29/97 at 2.) The Arizona Supreme Court agreed, finding that Maish did not interrogate Petitioner or use any tactics designed to elicit information and that Petitioner's statements were unsolicited. *Smith*, 193 Ariz. at 460, 974 P.2d at 439. These findings of fact are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1).

Petitioner first argues that no deference is owed to the state supreme court's determination because it erroneously focused on whether Officer Maish had interrogated Petitioner, not whether Maish deliberately elicited incriminating information. He asserts that the interrogation standard is appropriate only for assessing a violation of the Fifth Amendment right against compulsory self-incrimination, not the Sixth Amendment right to counsel. While it is true that statements may be taken in violation of a defendant's Sixth Amendment right to counsel even absent "interrogation," *see Rhode Island v. Innis*, 446 U.S. 291, 300 n.4 (1980), the question of whether Officer Maish interrogated Petitioner under *Innis* or deliberately elicited information under *Massiah* draws upon the same facts. *See United States v. Henry*, 447 U.S. 264, 271 (1980) (noting that "affirmative interrogation, absent waiver, would certainly satisfy *Massiah*"). Moreover, Petitioner's argument ignores the plain language of the Arizona Supreme Court's decision. First, the state court cited appropriate controlling federal law, noting that in *Kuhlmann v. Wilson* the Court held that the

---

[5] Because the Court determines that Officer Maish did not deliberately elicit Petitioner's statements and thus Petitioner cannot demonstrate a Sixth Amendment violation, it is unnecessary to decide whether the complaint filed against Petitioner pursuant to Arizona Rule of Criminal Procedure 2.2 the day prior to his arrest commenced adversary judicial proceedings for the purpose of determining if his right to counsel under the Sixth Amendment had in fact attached. *Cf. Edwards v. Arizona*, 451 U.S. 477, 480 n.7 (1981) (declining to decide whether right to counsel triggered by filing of complaint under Ariz. R. Crim. P. 2.2).

"the Sixth Amendment is not violated whenever – by luck or happenstance – the State obtains incriminating statements from the accused after the right to counsel has attached." *Smith*, 193 Ariz. at 459-60, 974 P.2d at 438-39 (quoting *Kuhlmann*, 477 U.S. 436, 459 (1986)). Second, the state court expressly found, similar to the Court in *Kuhlmann*, that Petitioner's statements were unsolicited and that Officer Maish did not "use any tactics designed to elicit information." *Id.* The state court clearly undertook the appropriate inquiry in determining that Maish did not deliberately elicit Petitioner's statements.

Petitioner next argues that the state court's ruling rests on an unreasonable determination of the facts. He asserts that Maish deliberately elicited incriminating information by first eliciting a "moral judgment" concerning Petitioner's ex-wife's methamphetamine use in the presence of her son and then inducing Petitioner to reveal the methamphetamine in his possession by commenting on his physical appearance. (*Id.* at 264-65.) He characterizes as "self-serving" Maish's testimony that subsequent incriminating comments (concerning the motor home and being acquainted with the victims) were unsolicited and not in response to any question. (*Id.* at 266-67.) He further argues that Maish's credibility was undermined by his initial questioning of Petitioner at the time of his arrest concerning a discarded shirt. (*Id.* at 268.) This, Petitioner asserts, establishes that Maish deliberately elicited incriminating statements. The Court disagrees.

The only evidence before the state court relating to Petitioner's statements to Officer Maish was Maish's own testimony. Although Petitioner testified at the suppression hearing, he was not asked any questions relevant to his conversation with Maish and did not challenge the sequence of events with regard to these statements. There is nothing in the record to dispute Maish's claim that during the two and a half hours he sat with Petitioner they mainly engaged in "small talk" about elk hunting, living in Colorado, and working in New Mexico. (RT 5/29/96 at 129.) There is also no dispute that Petitioner initiated the conversation concerning his ex-wife. Although Officer Maish affirmatively commented on Petitioner's appearance and that comment ultimately led Petitioner to surrender the methamphetamine in his possession, neither the appearance comment nor the drugs had any connection to the

crime of which Petitioner was accused. Furthermore, it was Petitioner, not Maish, who raised the issue of the motor home and voluntarily conveyed his knowledge of the victims. Simply put, the record nowhere indicates that Maish's conversations with Petitioner were designed to "intentionally creat[e] a situation likely to induce [Petitioner] to make incriminating statements without the assistance of counsel." *Henry*, 447 U.S. at 274. The Arizona Supreme Court's resolution of Petitioner's Sixth Amendment challenge to the admission of his statements to Officer Maish was not based on an unreasonable determination of the facts or law.

*Statements to Detective Rice*

At the suppression hearing, Petitioner testified that after he invoked his right to counsel and the first interrogation ended but before he was escorted down to the garage where he allegedly made the "I don't see why I shouldn't just tell you" statement, he was seated at a table in the police station waiting for transport when Detective Rice accused him "of doing something to my wife as in something matching this crime I'm on trial for or will be on trial for now, possibly doing bodily harm to her, and he also asked me if I had done this to anybody else in my life." (RT 5/31/96 at 151.) Detective Rice testified that during the 30 to 35-minute period Petitioner was seated at the table before transport the topic of Petitioner's ex-wife "may have come up in conversations when we were making arrangements to leave as far as what was going to happen to [Petitioner's son] Patrick" and that he "may have asked where she was, or something like that." (RT 5/30/96 at 53, 54.) While en route to Flagstaff, Petitioner referred to a prior question by Detective Rice regarding his ex-wife:

TS:  This is the only time I've done anything at all like this – (inaudible).

MR:  I believe you.

TS:  Uh – (inaudible) 'cuz you asked me – in the jail – what did you do with your wife or anything – because – she – the last time I saw her she was OK.

MR:  Yeah – well they – we can probably track her down.

TS:  Uh – a big – if – if the address that they have is not – her parents actual

18

w.. [sic] address – it's just right up and down the street.

MR:  OK.

TS:  They – uh – they've got their names – they ought to be able to figure it out from that.

(PCR-ROA 23, Ex. B, Vehicle Interview at 30-31.)  When defense counsel confronted him with this passage at the suppression hearing, Detective Rice acknowledged that he had engaged in an unrecorded conversation with Petitioner at the jail about where his ex-wife might be.  (RT 5/30/96 at 57-58.)  However, he denied questioning him about the investigation, commenting on his invocation of his right to an attorney, or pleading with him to answer investigative questions.  (RT 5/29/96 at 185.)  He further denied verbally abusing Petitioner or accusing him of killing his ex-wife.  (*Id.* at 193.)

In addressing this issue on appeal, the Arizona Supreme Court stated:

> Smith asserts that his confessions to the police were made after he requested counsel and that he did not reinitiate contact.  However, it is not clear if he is arguing 1) that he did not reinitiate contact because he never said, "I don't see why I shouldn't just tell you," or 2) even if he said it, the police initiated contact first, or 3) that even if he said it, the statement did not rise to the level of one intended to reinitiate contact.[FN1]  At all events, we cannot agree that Smith did not reinitiate contact.

> FN1. These three arguments were made in Smith's Motion to Suppress at trial.

> First, during the suppression hearing, Smith neither admitted nor denied saying, "I don't see why I shouldn't just tell you."  Rather, he stated that he did not recall making the statement.  Tr. May 31, 1996 at 157.  Although this statement was not recorded, Detective Rice immediately wrote it in his notebook.  In addition, after setting up a recorder, Detective Rice asked Smith if his earlier statement meant that he wanted to talk to them after all – he did not simply resume questioning.  Smith did not ask, "What earlier statement?" or express confusion over the detective's question.  It is reasonable to infer that Smith did make the statement and thus reinitiated contact with the police.

> Second, no evidence exists, except Smith's own assertion, that Detective Rice was the one who reinitiated the contact.  Third, Detective Rice stopped questioning and ended the first interrogation after Smith invoked his right to counsel.  After being transferred downstairs to the car, Smith said to Rice, "I don't see why I shouldn't just tell you."  Tr. Apr. 15, 1997 at 149.  As we have already stated, this statement indicated a desire to discuss the investigation.  Therefore, Smith did intend to reinitiate contact and waive his rights.  His statements are admissible.

*Smith*, 193 Ariz. at 458-59, 974 P.2d at 437-38.

19

Petitioner asserts that the Arizona Supreme Court's findings are entitled to no deference because the state court "completely ignored highly probative evidence which corroborated Mr. Smith's version of events." (*Id.* at 271.) Specifically, he argues that Detective Rice improperly reinitiated contact with Petitioner by accusing him of killing his ex-wife, and, therefore, his second and third statements to Rice were obtained in violation of his right to counsel under the Sixth Amendment.[6] (Dkt. 24 at 270-71.) He further argues that there was no evidence to corroborate Detective Rice's assertion that Petitioner reinitiated contact or that he validly waived his right to counsel. (*Id.* at 274, 280-82.)

The transcript of Petitioner's statements while en route to Flagstaff supports an inference that Detective Rice may have questioned Petitioner about hurting his ex-wife. However, Detective Rice expressly denied doing so and asserted that any questioning concerning Petitioner's ex-wife was limited to determining her whereabouts. Thus, there is an equally plausible inference from the record that this conversation took place solely to assist authorities in placing Petitioner's son, not to elicit an incriminating response. As such, this Court cannot say that the Arizona Supreme Court unreasonably found that Detective Rice did not reinitiate questioning. *King v. Schriro*, 537 F.3d 1062, 1068 (9th Cir. 2008) ("State court factual determinations stand, even if we would not reach them on the same record, unless there is 'clear and convincing evidence' that they are 'objectively unreasonable.'"); *Hall v. Washington*, 106 F.3d 742, 748-49 (7th Cir. 1997) ("The statutory 'unreasonableness' standard allows the state court's conclusion to stand if it is one of several equally plausible outcomes."). Furthermore, Petitioner made no incriminating statements following the alleged questioning by Detective Rice at the conference table, and he testified during the suppression hearing that he was aware, prior to getting into the police car, that he did not have to talk to Detective Rice because he had "asked for a lawyer" and this meant he could not be further questioned. (RT 5/31/96 at 156, 178-79.)

---

[6] Petitioner does not challenge his waiver of rights at the start of the first interrogation by Detective Rice, which concluded after Petitioner unequivocally requested the assistance of counsel.

Similarly, this Court cannot say that it was objectively unreasonable for the Arizona Supreme Court to conclude that Petitioner made the statement, "I don't see why I shouldn't just tell you" and that this statement indicated a desire to discuss the investigation. As the state court observed, Petitioner did not deny making the statement. Detective Rice immediately made a notation in his notebook documenting the statement and relayed the statement to another detective. (RT 5/29/96 at 191-92; RT 5/31/96 at 36.) While en route to Flagstaff, Rice confirmed that Petitioner's earlier statement meant he wanted to talk to them. And as just noted, Petitioner understood prior to getting into the car that he did not have to talk and that the police could not further question him because he had requested a lawyer. Thus, this case is clearly distinguishable from *Brewer v. Williams*, 430 U.S. 387 (1977), on which Petitioner relies. In *Williams*, police officers transporting the defendant deliberately engaged in a wide-ranging conversation, including the topic of religion, and implored the defendant to reveal the location of the young victim so that she could be given a "Christian burial," despite the defendant's clear intention to follow his counsel's advice to not speak to the police while in transit. 430 U.S. at 392-93. Here, without any prompting or questioning from the detectives, Petitioner spontaneously indicated that he would talk and subsequently relayed details of the crime during the drive to Flagstaff.

In conclusion, the Arizona Supreme Court's resolution of Petitioner's Sixth Amendment challenge to the admission of his statements to Detective Rice was not based on an unreasonable determination of the facts or law.

<u>Fifth Amendment Analysis</u>

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that prior to custodial interrogation a suspect must be informed of his right to remain silent and his right to have an attorney present. In *Rhode Island v. Innis*, the Court explained that

> the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

21

466 U.S. at 300-01 (footnotes omitted).  The definition of interrogation set forth in *Innis* "focuses primarily upon the perceptions of the suspect."  *Id.* at 301.  However, "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions that they should have known were reasonably likely to elicit an incriminating response."  *Id.* at 302.

In addressing this claim on direct appeal, the Arizona Supreme Court stated:

> Smith argues that the first statements he made while in custody were in violation of *Miranda* because they were made after he was in custody but before he was advised of his rights.  It is not clear from Smith's Opening Brief to which statements he is referring.  However, the only inculpatory statements were those made to Officer Maish, so we address them.
>
> . . . .
>
> Officer Maish did not give Smith *Miranda* warnings because he had no intention of conducting an interrogation.  His responsibility was simply to watch Smith while waiting in an unsecured holding room until Detective Rice arrived from Flagstaff.  While sitting with Smith, they engaged in small talk about Colorado and elk hunting.  Smith told Officer Maish he removed the license plate from his motor home and admitted meeting the Tannehills.  He also talked about his ex-wife and her drug problems, as well as his own "casual" use of methamphetamine, stating that he had used the drug two days earlier.  During the course of the conversation, Officer Maish told Smith he did not look well for his age and that such an appearance is usually caused by sickness or drug use.  Smith said that he was not an addict just because he had some methamphetamine.  Officer Maish responded, "What meth?"  Tr. May 29, 1996 at 134.  Smith then produced a small amount of the drug from his pants pocket.
>
> The evidence supports the trial court's finding that Officer Maish did not interrogate Smith.  His statements and questions were in response to Smith's questions and conversation.  None of Officer Maish's statements rise to the level of *Innis*-type questions – those designed to elicit incriminating responses.  As the trial court stated, Officer Maish's statements "were not made . . . with the expectation that they would lead to incriminating statements by the defendant."  Minute Entry, Mar. 20, 1997.

*Smith*, 193 Ariz. at 457-58, 974 P.2d at 436-37.

As already discussed with respect to the Sixth Amendment, the record does not support an inference, let alone a finding, that Maish's conversation with Petitioner had the motive or likely effect of interrogation.  Nor was it reasonably foreseeable that Petitioner would make spontaneous statements concerning his motor home and the victims following the question about Petitioner's appearance and the revelation concerning his

methamphetamine possession. The Arizona Supreme Court's resolution of Petitioner's Fifth Amendment challenge to the admission of his statements was not based on an unreasonable determination of the facts or law.

<u>Voluntariness Analysis</u>

Petitioner contends that his statements were involuntary, in violation of the Fourteenth Amendment Due Process Clause, because he was deprived of sleep and food, was "coming down" from methamphetamine he had ingested shortly before his arrest, and was deprived access to his son. (Dkt. 24 at 299, 306-07.)

In evaluating the voluntariness of a confession, "the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Derrick v. Peterson*, 924 F.2d 813, 817 (9th Cir. 1990) (citing *Haynes v. Washington,* 373 U.S. 503, 513-14 (1963)). Coercive police activity, including lengthy questioning, deprivation of food or sleep, physical threats of harm, and psychological persuasion, is a necessary predicate to a finding that a confession is not voluntary. *Colorado v. Connelly*, 479 U.S. 157, 167, (1986). Personal characteristics of the defendant are constitutionally irrelevant absent proof of coercion. *Derrick*, 924 F.2d at 818.

Although the ultimate issue of voluntariness is a mixed question of law and fact, *Miller v. Fenton*, 474 U.S. 104, 111-12 (1985), subject to review under the standards set forth in 28 U.S.C. § 2254(d)(1), any subsidiary factual findings made by the state court are entitled to a "presumption of correctness" under § 2254(e)(1). These include findings concerning the tactics used by the police and other circumstances of the interrogation. *Miller*, 474 U.S. at 112, 117. With respect to such findings, Petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Williams*, 529 U.S. at 407; *Villafuerte v. Stewart*, 111 F.3d 616, 626 (9th Cir. 1997).

On appeal, the Arizona Supreme Court ruled:

> The trial court conducted a four-day suppression hearing on the voluntariness of Smith's statements and found all statements made after he arrived at the Phoenix police station were admissible. While there is some

evidence that Smith may have consumed methamphetamine shortly before his arrest, the police did not perceive Smith to be under the influence of or withdrawing from drugs. In addition, Smith himself told Officer Maish that he had not consumed drugs for a couple of days before his arrest. Smith did not behave in a bizarre or unusual way. His speech was clear. He was not unkempt. He was not hysterical, hallucinating, or disoriented. On the contrary, he was friendly and cooperative. Smith appeared to understand his discussions with police, was aware of his rights, and could communicate. The police did not threaten, intimidate, or make promises to induce him to speak. No evidence exists that police conduct coerced him to speak.

In addition, Smith understood the meaning of his statements. *Tucker,* 157 Ariz. at 446, 759 P.2d at 592. For example, Smith invoked his right to a lawyer during his first interrogation when the detective presented him with incriminating evidence. Thus, he was able to understand the inculpatory nature of the evidence and the need to protect himself by invoking his rights. We affirm the trial court's ruling that Smith's statements were voluntary.

*Smith*, 193 Ariz. at 457, 974 P.2d at 436.

Other than arguing that the Arizona Supreme Court "obviously failed to look at all the evidence" concerning Petitioner being under the influence of or withdrawing from drugs, Petitioner does not articulate how the court's ruling was based on an unreasonable determination of the facts or law. (Dkt. 24 at 305.) Nor does he specifically identify coercive activity by the police. He asserts that he was sleep deprived as a result of a methamphetamine binge, not purposeful action by authorities. He also asserts that he had not eaten much food, but there is no indication in the record that he ever requested food in the less than five hours he spent at the Phoenix police station or while in transit to Flagstaff. With regard to his son, Petitioner was initially in the same general area as Patrick before being placed in an interview room. (RT 4/10/97 at 217.) At that point, he had no interaction with his son. (RT 4/29/96 at 55-56, 94, 180-81; RT 4/30/96 at 66.) The record does not support Petitioner's implication that he was in any way threatened by authorities to make a statement in exchange for access to his son. Petitioner testified only that he was refused an opportunity to say good-bye to him prior to leaving for Flagstaff. (RT 5/31/96 at 150.)

There is some indication that Petitioner may have ingested methamphetamine shortly before being arrested. (*Id.* at 145-46; RT 7/25/96 at 5, 24.) Detective Rice acknowledged that Petitioner's voice was at times slurred and he may have been coming off of drugs; however, he and several other officers testified that Petitioner was coherent and able to

converse, and did not appear to be under the influence of an intoxicant. (RT 4/16/97 at 75-76; RT 4/30/96 at 49; RT 4/29/96 at 22-23, 26-27, 66, 86, 93, 110, 114-15, 140.) Petitioner's own expert could not say whether Petitioner was under the influence of methamphetamine when he waived his rights and made incriminating statements. (RT 5/31/96 at 110-11.) Thus, the Arizona Supreme Court's finding of fact on this point was not objectively unreasonable. Furthermore, nothing in the record supports Petitioner's argument that police took advantage of any diminished condition to coerce waiver of his *Miranda* rights at the start of Detective Rice's first interrogation or his spontaneous decision to waive his previously-invoked right to counsel prior to getting into the police car. It is well settled that a "defendant's mental state alone does not make a statement involuntary"; rather, "[c]oercive conduct by police must have caused him to make the statements." *United States v. Turner*, 926 F.2d 883, 888 (9th Cir. 1991) (citing *Colorado v. Connelly*, 479 U.S. at 169-71). Here, there was no coercive activity and thus Petitioner's statements were voluntary.

Petitioner also argues that Officer Maish and Detective Rice engaged in the type of two-step interrogation strategy at issue in *Missouri v. Seibert*, 542 U.S. 600 (2004). (Dkt. 24 at 290-91.) "The object of [the] question-first [tactic] is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." 542 U.S. at 611. However, as already set forth, Officer Maish did not interrogate Petitioner, and thus the subsequent interview by Detective Rice did not constitute "coordinated and continuing interrogation." *Id.* at 613. In addition, after Rice provided *Miranda* warnings and began the first interrogation, Petitioner did not repeat the same statements he had made to Maish and did not confess to the crime. Rather, he vehemently denied killing the victims and invoked his right to counsel.

In sum, the Court finds that the Arizona Supreme Court's finding of voluntariness was not based on an objectively unreasonable determination of the facts or law.

Conclusion

Petitioner has not established that his statements were obtained in violation of the Fifth, Sixth, or Fourteenth Amendments. Therefore, he is not entitled to relief on Claim 6.

**Claim 1:        Premeditation Instruction**

Petitioner alleges that the trial court erroneously instructed the jury regarding the definition of premeditation, in violation of his rights under the Sixth and Fourteenth Amendments.  (Dkt. 24 at 81.)  In its March 21, 2006 order, the Court determined that Petitioner had failed to properly exhaust the federal basis of this claim.  However, because Respondents expressly conceded exhaustion, the Court ruled that Claim 1 should be addressed on the merits.  (Dkt. 64 at 10.)

An allegedly improper jury instruction will merit habeas relief only if "the instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *see Jeffries v. Blodgett*, 5 F.3d 1180, 1195 (9th Cir. 1993).  The instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  It is not sufficient for a petitioner to show that the instruction is erroneous; instead, he must establish that there is a reasonable likelihood that the jury applied the instruction in a manner that violated a constitutional right. *Id.*; *Carriger v. Lewis*, 971 F.2d 329, 334 (9th Cir. 1992) (en banc).  "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). Petitioner cannot make this showing.

At the time of Petitioner's trial, A.R.S. § 13-1101(1) defined premeditation as follows:

> "Premeditation" means that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection.  An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.[7]

A.R.S. § 13-1101(1) (West 1997).   In this case, the trial court gave the following

---

[7]    In 1998, A.R.S. § 13-1101(1) was amended to clarify that proof of actual reflection "is not required."

premeditation instruction:

> "Premeditation" means that the defendant's intention or knowledge existed before the killing long enough to permit reflection. However, the reflection differs from the intent or knowledge that conduct will cause death. *It may be as instantaneous as successive thoughts in the mind*, and it may be proven by circumstantial evidence. It is this period of reflection, regardless of its length, which distinguishes first degree murder from intentional or knowing second degree murder.

(ROA 189 (emphasis added).) The court did not include the latter provision of § 13-1101(1), that "[a]n act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion."

Arguably, this omission, combined with the phrase "instantaneous as successive thoughts," rendered the instruction erroneous under state law. *See State v. Ramirez*, 190 Ariz. 65, 67-68, 945 P.2d 376, 378-79 (Ct. App. 1997) (instruction that omitted the "balancing language" contained in the "instant effect" provision allowed the State to "mis-argue" that "an act can be both impulsive and premeditated"); *State v. Thompson*, 204 Ariz. 471, 479, 65 P.3d 420, 478 (2003) (discouraging use of "instantaneous as successive thoughts" phrase).

Nonetheless, the court's instruction on premeditation did not render Petitioner's trial fundamentally unfair. Petitioner's argument to the contrary notwithstanding, the Arizona Supreme Court in *Thompson* did not find the instruction at issue unconstitutional; rather it found erroneous a premeditation instruction that stated "actual reflection is not required." 204 Ariz. at 480, 65 P.3d at 429. The court did "discourage" use of the phrase "instantaneous as successive thoughts of the mind," *id.* at 479, 65 P.3d at 428; however, the use of an "undesirable, erroneous, or even 'universally condemned'" instruction does not equate to a constitutional violation, *Cupp*, 414 U.S. 141, 146 (1973).

Petitioner argues that the instruction relieved the prosecution of its burden of proving actual reflection. The Court disagrees. The instruction does not, on its face, permit a finding of premeditation based solely on the passage of time, but specifically states that first degree murder requires a "period of reflection." It explicitly distinguishes intent as existing before, and as something distinct from, reflection. In addition, nothing in the remainder of the

court's instructions inaccurately suggested that the State needed only to prove the time element of reflection in lieu of actual premeditation.

In addressing Petitioner's argument on direct appeal, the Arizona Supreme Court recognized the existence of a conflict in the Arizona courts of appeal over whether premeditation requires actual reflection or a length of time to permit reflection. *Smith*, 193 Ariz. at 460, 974 P.2d at 339. However, the court declined to reach the issue because Petitioner was also convicted of felony murder, which does not require a finding of premeditation, and Petitioner did not challenge his felony murder convictions on appeal. *Id.* This Court agrees with this analysis. Premeditation is not a factor relevant to felony murder. Consequently, any error regarding the premeditation instruction did not so infect the trial that it violated due process. The Arizona Supreme Court's resolution of this claim was neither contrary to nor an unreasonable application of controlling federal law.

### Claims 2 and 4: Ineffective Assistance of Trial Counsel

Petitioner asserts that trial counsel's representation was constitutionally deficient because counsel permitted a testifying crime scene reconstructionist to interview Petitioner (Claim 2) and because counsel failed to object to the late notice of, and to interview prior to trial, the State's mental health expert (Claim 4). (Dkt. 24 at 98-117, 227-36.) Petitioner further asserts ineffective assistance of appellate counsel for failing to raise on appeal a claim challenging the untimely disclosure underlying Claim 4. (*Id.* at 227.) Respondents concede that Petitioner properly exhausted these claims in his state PCR proceedings. (Dkt. 32 at 24, 48.)

In summarily denying relief, the PCR court stated only that "there is nothing in the points raised by the defendant that would have reasonably caused a different result in this matter." (PCR-ROA 40 at 3.) Because the PCR court decided the merits of these claims without providing its rationale, this Court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *See Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167. For the reasons set forth below, the Court concludes that Petitioner is not entitled to relief on either claim.

The clearly established federal law for claims alleging ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. 466 U.S. at 687-88. "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.*

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. Thus, to satisfy *Strickland*'s first prong, deficient performance, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Because an ineffective assistance of counsel claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed").

Under the AEDPA, this Court's review of the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *see Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (noting that a "doubly deferential" standard applies to *Strickland* claims under AEDPA). Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an objectively

29

unreasonable application of *Strickland*. 28 U.S.C. § 2254(d)(1).

Crime Scene Reconstructionist

Prior to trial, the defense enlisted the services of James Jarrett, a member of a firm that reconstructs violent incidents. (RT 4/18/97 at 3.) Jarrett reviewed a large volume of police reports, evidence logs, photographs, medical examiner reports, and transcripts of witness interviews. (*Id.* at 32.) He also interviewed Petitioner on several occasions and examined the victims' trailer, Petitioner's motor home, and the physical evidence collected by law enforcement. (*Id.* at 33.) At trial, Jarrett testified that the disorganized crime scene demonstrated that the offense was neither planned nor calculated. (*Id.* at 35-36.) He opined that Mr. Tannehill likely deflected Petitioner's gun with his hand, causing an involuntary discharge. (*Id.* at 38-42.) Seconds later, according to Jarrett, Petitioner beat the victims with the gun and then rummaged through the trailer grabbing valuables. (*Id.* at 44-47.) As he turned back to the victims, Petitioner saw movement, perceived a threat from the Tannehills, and attacked them with a knife. (*Id.* at 47-48.) In Jarrett's opinion, the entire incident occurred in three to five minutes, during which Petitioner operated in a reflexive mode. (*Id.* at 49, 59.)

Petitioner argues that trial counsel were ineffective for permitting Jarrett to interview Petitioner because Jarrett asked him numerous questions that provided information to the prosecutors – through their pre-trial interview of Jarrett – that otherwise would not have been available to them. (Dkt. 24 at 98-104.) This included Petitioner's conscious decision to choose victims that were the furthest from other people and to wait to commit the robbery until after his son had gone to bed. (*Id.* at 100.) He further argues that the government's cross-examination of Jarrett provided evidence that Petitioner "carefully selected his homicide victims and premeditated their murder" and "also provided the proof subsequently used by the trial court in finding the aggravating factor of cruelty (noting that Mrs. Tannehill suffered emotional anguish in watching her husband being beaten by Mr. Smith) and pecuniary gain." (*Id.* at 113, 117.)

The Court has carefully reviewed Jarrett's testimony at trial and concludes that

Petitioner has failed to establish ineffectiveness from counsel's decision to utilize Jarrett. First, Jarrett's testimony bolstered the defense theory that Petitioner did not premeditate the killings but instead acted in an impulsive, reflexive manner. Second, nothing Petitioner told Jarrett came out either on direct or cross examination because, as the parties at trial recognized, it was inadmissible hearsay. Third, Jarrett's testimony did not provide information with respect to premeditation that was significantly different from evidence that was already before the jury from Petitioner's own statements and the physical evidence, and Petitioner was also unanimously convicted of felony murder. Finally, the judge did not rely on Jarrett's testimony in its findings at sentencing.

In both opening statement and closing argument, defense counsel focused almost exclusively on the question of whether Petitioner premeditated the Tannehills' murders. Counsel asserted that as a result of head injuries, drug abuse, and psychological deficits, Petitioner's actions were impulsive, not premeditated. (*See, e.g.*, RT 4/23/97 at 75, 97.) This defense was based on *State v. Christensen*, 129 Ariz. 32, 35-36, 628 P.2d 580, 583-84 (1981). *See also Vickers v. Ricketts*, 798 F.2d 369, 371 (9th Cir. 1986).

In *Christensen*, the defendant sought to admit expert testimony regarding his tendency to act without reflection. The Arizona Supreme Court held it was error to exclude such testimony because "establishment of [this character trait] tends to establish that appellant acted impulsively. From such a fact, the jury could have concluded that he did not premeditate the homicide." *Christensen*, 129 Ariz. at 35, 628 P.2d at 583. However, the *Christensen* rule is limited in that an expert cannot testify as to whether the defendant was acting impulsively at the time of the offense.[8] *Id.* at 35-36, 628 P.2d at 583-84; *see also State*

---

[8]    Unlike other states such as California, Arizona has long rejected diminished mental capacity as an affirmative defense. *State v. Mott*, 187 Ariz. 536, 540-41, 931 P.2d 1046, 1050-51 (1997) (disallowing expert testimony regarding a defendant's mental disorder at the time of the offense, short of insanity, as an affirmative defense or to negate the *mens rea* element of a crime); *see also Clark v. Arizona*, 548 U.S. 735 (2006) (upholding the rule established in *Mott*). Because counsel determined that an insanity defense was not viable in this case, they were prohibited from presenting expert testimony regarding Petitioner's

*v. Arnett*, 158 Ariz. 15, 22, 760 P.2d 1064, 1071 (1988) (emphasizing that although expert testimony is admissible to establish personality trait of acting without reflection, testimony of a defendant's probable state of mind at time of the offense is not permitted); *State v. Rivera*, 152 Ariz. 507, 514, 733 P.2d 1090, 1097 (1987) (same).

In light of the *Christensen* rule, counsel was prohibited from eliciting from their mental health experts any opinion as to Petitioner's state of mind at the time of the offense, in particular whether Petitioner acted reflexively and not reflectively. However, Jarrett, who had inspected the crime scene and reviewed all of the relevant evidence, was permitted to testify to his opinion that the killings had not been planned and that Petitioner had acted reflexively in response to the accidental discharge of the gun and a perceived threat from Mr. Tannehill. Thus, his testimony benefitted the defense and it was not objectively unreasonable for defense counsel to call him as a witness. *See Strickland*, 466 U.S. at 689 (observing that counsel enjoys "wide latitude . . . in making tactical decisions").

Petitioner recounts in detail the questions Jarrett asked Petitioner in their interviews, the inculpatory notes Jarrett maintained during the interviews, and Jarrett's "damaging" pre-trial interview with the prosecution. However, none of this allegedly damaging information was admitted at trial. Indeed, following an objection by the prosecution, defense counsel asked Jarrett to base his opinion as to the sequence of events solely on his review of Petitioner's statements to police and the forensic evidence. (RT 4/18/97 at 43-44.) Although the sidebar discussion regarding this objection was not recorded, in a later discussion on the record concerning the scope of Jarrett's testimony, defense counsel commented that "the Court and [the prosecutor] and I discussed this at the bench and [Jarrett] was cautioned not to [testify that Mr. Tannehill had hit Petitioner with a flashlight] because that would involve hearsay statements on the part of my client which are inadmissible." (RT 4/21/97 at 91.) Moreover, it is evident from the record that the prosecutor did not elicit in her cross-

_____

mental state at the time of the crime and had available only an "impulsivity character trait defense" under *Christensen*.

examination of Jarrett any of Petitioner's statements to Jarrett. (*See* RT 4/18/97 at 61-86.) Rather, her questions were based on other evidence already admitted at trial: the fact that Petitioner was in financial stress, that the victims were elderly, that their trailer was located in a relatively isolated part of the campground, that Petitioner had wrapped his hand in his son's shirt to feign an injury, that the gun was loaded, and that he had a knife.

In addition, Jarrett's testimony did not provide critical evidence of premeditation.[9] Rather, Petitioner's own statements as well as the testimony of other witnesses and the forensic evidence established that Petitioner was in financial stress, provided false identifying information to the campground hosts, chose elderly victims who were in an isolated part of the camping area, concocted a ruse to get into the victims' trailer, went to the trailer armed with a loaded gun and a large knife, and repeatedly hit the victims in the head before slitting their throats. This was sufficient evidence from which a reasonable juror could conclude that Petitioner acted with premeditation. Even if Jarrett's testimony was interpreted as providing evidence of premeditation, Petitioner was not prejudiced because he was also found guilty of felony murder. There is little question that there was sufficient evidence to establish felony murder based on Petitioner's own statements and the recovered jewelry and television.

Finally, Petitioner cannot establish prejudice at sentencing from Jarrett's testimony. As discussed below in Claims 7 and 9, the state court based its findings as to the pecuniary gain and cruelty aggravating factors primarily on Petitioner's statements. With regard to the cruelty factor, the Court expressly noted that none of the experts could say with certainty the exact order of events. "Although Defendant's expert, James Jarrett's account most closely follows the Defendant's version. *The Court then relies on the Defendant's statement of what happened*." (ME 67 at 4.) The Court further relied on the fact that Mrs. Tannehill had

---

[9]    In his reply brief, Petitioner relies heavily on juror declarations to support his claim that Jarrett's testimony was damaging. (Dkt. 37 at 44-45.) In its order denying evidentiary development, the Court stated that it would not consider Petitioner's proffered juror testimony to assess prejudice from any alleged trial or counsel errors because such evidence improperly delves into the jurors' mental processes and is inadmissible under both the common law and state and federal rules. (Dkt. 64 at 35-37.)

defensive wounds. (*Id.* at 5.)

In sum, the Court concludes that Petitioner has failed to establish either deficient performance or prejudice from counsel's representation with regard to reconstruction expert Jarrett. The PCR court's denial of Claim 2 was not based on an unreasonable application of *Strickland*.

State's Mental Health Expert

In his opening statement, defense counsel conceded that Petitioner killed the Tannehills, but asserted that, as a result of personality defects caused by long-term drug abuse and head injuries, the murders were not premeditated. (RT 4/7/97 at 55.) He further stated that Petitioner had taken on a different personality as a result of his problems and that he was acting in his role as Hondo, a bounty hunter who wears all black, when he killed the victims. (*Id.* at 59-60, 63.)

The State did not call any mental health experts in its case in chief. The defense called three experts: Dr. Thomas Gaughan, a psychiatrist; Dr. Adrian Raine, a psychologist; and Dr. Scott Sindelar, a neuropsychologist. Dr. Gaughan testified that he diagnosed Petitioner as suffering from attention deficit hyperactivity disorder, major depression, polysubstance dependence, learning disabilities, and a personality composed of narcissistic, histrionic, and antisocial elements. (RT 4/17/97 at 109-30.) He opined that Petitioner has "a well-established pattern of impulsive and reflexive behavior, largely due to a confluence of his attention deficit disorder, his substance abuse, [and] his personality disorder." (*Id.* at 131.) Drs. Raine and Sindelar further testified that Petitioner has "a very impulsive, non-reflective personality." (RT 4/18/97 at 169; RT 4/21/97 at 60-61.) On cross-examination, Dr. Gaughan conceded that Petitioner does not suffer from either a dissociative disorder, a multiple personality, or a fractured personality disorder. (RT 4/17/97 at 139.)

In rebuttal, the State called Dr. Steven E. Pitt as a witness. (RT 4/22/97.) Dr. Pitt testified that he was first approached by the State in September 1996 to review materials in the case, was not asked to prepare a report, and did not get involved again until several weeks prior to the start of trial when the State sent him the final defense expert reports. (*Id.* at 114,

125, 161.) He interviewed Petitioner on April 4, 1997, after jury selection had begun but before opening statements, and opined at trial that Petitioner had an antisocial personality disorder and that individuals who behave impulsively are capable of reflecting upon their actions. (*Id.* at 25, 47-49.)

Petitioner first argues that lead defense counsel was ineffective for waiting until the night before Dr. Pitt's rebuttal testimony to interview him. (Dkt. 24 at 228.) He further asserts that counsel "had absolutely no ability to tailor his defense to counter Dr. Pitt's testimony since he was completely unaware what that testimony would be." (*Id.*) He does not acknowledge that the prosecution disclosed a transcript of Pitt's interview with defendant as soon as it was completed. (RT 4/18/97 at 199.) Additionally, he does not make any specific assertions as to how counsel's alleged deficiency resulted in prejudice. Rather, he asserts summarily that counsel's "blunders . . . resulted in predictable and obvious prejudice to Mr. Smith." (*Id.* at 235.) This is wholly inadequate to support an ineffectiveness claim. *See Gonzalez v. Knowles*, 515 F.3d 1006, 1016 (9th Cir. 2008) (noting that speculation is insufficient to establish prejudice). Defense counsel thoroughly cross-examined Dr. Pitt. (RT 4/22/97 at 62-160.) Petitioner has failed to identify how either this cross-examination or his own experts' testimony would have differed had counsel interviewed Pitt prior to trial rather than the night before his testimony. The PCR court's denial of this aspect of Claim 4 was not based on an unreasonable application of *Strickland*.

Petitioner also argues that appellate counsel was ineffective for not raising a claim based on the prosecution's alleged late notice of Dr. Pitt. He asserts that "[b]ecause he had not received any information regarding Dr. Pitt's findings before trial, as required by the discovery rules, counsel should have asked the court to preclude Dr. Pitt from testifying." (Dkt. 37 at 64.) He does not actually cite the applicable discovery rule, but this Court's review of the Arizona Rules of Criminal Procedure reveals that Rule 15.1(f) requires the State to disclose "the names and addresses of all persons whom the prosecutor will call as rebuttal witnesses together with their relevant written or recorded statements" after it receives the defendant's notice of defenses.

35

A review of the record does not reveal any lack of notice to defense counsel with regard to the State's decision to call Dr. Pitt as a rebuttal witness. Rather, defense counsel complained that, without notifying the defense, Dr. Pitt had undertaken interviews with a number of witnesses who had already testified at trial. (*Id.* at 195.) Counsel was concerned that the witnesses may have said something different in their interviews with Pitt and that he needed to be prepared to recall them as sur-rebuttal witnesses. (*Id.* at 196, 201-03.) In the end, as defense counsel stated in closing argument, Dr. Pitt "got no new information." (RT 4/23/97 at 46.)

Under Arizona law, sanctions for a disclosure violation may include preclusion of a witness. *State v. Tucker*, 157 Ariz. 433, 439, 759 P.2d 579, 585 (1988). The question of whether to impose a sanction is discretionary "and will not be disturbed on appeal absent a showing of abuse." *Id.* "Generally, there is no abuse of discretion if the defendant suffers no prejudice. In other words, even if there is a failure to remedy a discovery violation, a subsequent conviction will not be reversed on that account unless the defendant can demonstrate prejudice from the violation." *Id.* (citations omitted).

This Court easily concludes, in light of the record and established state law, that the Arizona Supreme Court would have denied on direct appeal any claim challenging untimely disclosure of Dr. Pitt because there is simply no evidence to suggest Petitioner was prejudiced either by the lack of notice that Dr. Pitt had re-interviewed some of the trial witnesses or by the fact that the State did not arrange for an earlier interview of their rebuttal expert witness. Consequently, Petitioner has failed to establish that appellate counsel's failure to raise such a claim amounted to constitutionally inadequate representation or that the PCR court's denial of this aspect of Claim 4 was based on an unreasonable application of *Strickland*.

**Claim 3:    Prosecutorial Misconduct**

Petitioner asserts that the prosecutor improperly:  (A) argued irrelevant prejudicial matters during closing; (B) attacked defense counsel and experts; (C) vouched for the State's case; (D) evoked sympathy for the victims; (E) provided prejudicial expert rebuttal

36

testimony; (F) commented on Petitioner's invocation of his right to counsel; and (G) shifted the burden of proof. (Dkt. 24 at 118-227.) He further argues that trial and appellate counsel's failures to object and to present these misconduct allegations on direct appeal constituted ineffective assistance of counsel. (*Id.*) In its order of March 21, 2006, the Court determined that each of Petitioner's misconduct allegations is entitled to merits review. (Dkt. 64 at 11-12.) Similarly, the Court concluded that, except for the conduct described in subpart F, Petitioner's ineffective assistance claims are also entitled to merits review. (*Id.* at 12-13.)

Petitioner raised Claim 3 in his PCR petition. The PCR court addressed only the ineffective assistance aspect of the misconduct allegations, summarily concluding that Petitioner had failed to establish prejudice. (ROA-PCR 40.) Because the PCR court decided the merits of the claims without providing its rationale, this Court independently reviews the record to assess whether the state court's decision was objectively unreasonable under controlling federal law. *See Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167. However, because the PCR court did not address the merits of the underlying prosecutorial misconduct claims that were also raised in the PCR petition, this Court conducts a *de novo* review of those aspects of Claim 3. *Pirtle*, 313 F.3d at 1167-68 & n.4.

The standard of federal habeas review for a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Therefore, to prevail on a claim of prosecutorial misconduct, Petitioner must prove not only that the prosecutor's actions were improper but that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *DeChristoforo*, 416 U.S. at 643.

<u>Closing Argument</u>

In determining if a defendant's due process rights were violated by a prosecutor's remarks during closing argument, a reviewing court "must consider the probable effect of the

prosecutor's [comments] on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985). To make such an assessment, it is necessary to place the prosecutor's remarks in context. *See Boyde v. California*, 494 U.S. 370, 385 (1990); *United States v. Robinson*, 485 U.S. 25, 33-34 (1988); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998). In *Darden*, for example, the Court assessed the fairness of the petitioner's trial by considering, among other circumstances, whether the prosecutor's comments manipulated or misstated the evidence; whether the trial court gave a curative instruction; and the weight of the evidence against the accused. 477 U.S. at 181-82.

As a general rule, a prosecutor may not vouch for the credibility of a witness. *See Young*, 470 U.S. at 18-19; *Lawn v. United States*, 355 U.S. 339, 359-60 n.15 (1958); *Berger v. United States*, 295 U.S. 78, 86-88 (1935). "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993) (citing *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980)). Vouching constitutes misconduct because it may lead the jury to convict on the basis of evidence not presented; it also carries the imprimatur of the government, which may induce the jury to adopt the government's judgment rather than its own. *See Young*, 470 U.S. at 18.

Petitioner argues that in closing argument the prosecutor improperly (1) attempted to destroy the credibility of defense counsel and the defense experts; (2) denigrated his impulsivity defense by suggesting it was a sham; and (3) vouched for the credibility of the State's witnesses and the strength of the prosecution's case. (Dkt. 24 at 120-50.) Specifically, he claims misconduct from the prosecutor "repeatedly denigrating his defense by characterizing it as an 'attempt to divert' the jurors' attention away from the true 'facts' of the case, suggesting the defense was fabricated to the extent that defense counsel 'created' a defense that was 'sensational', 'and created an issue about mental status.'" (*Id.* at 125.) He further asserts that the prosecutor insinuated that the defense experts were "paid mouthpieces" and that they were "nonobjective, nonprofessional and unethical." (*Id.* at 132.)

With regard to vouching, Petitioner contends that the prosecutor repeatedly expressed her opinion on the strength of the government's case and the quality of Detective Rice's investigation. (*Id.* at 137-38.)

In her closing argument, the prosecutor responded to the defense's questioning of the State's failure to analyze tire tracks and shoe prints collected from the crime scene by asserting that the defense was trying to confuse the issues. (RT 4/23/97 at 7-8.) She continued this "confusion" theme with regard to defense counsel's assertion in his opening statement that "Hondo did it" and argued:

> I appreciate the idea of coming up with something that is sensational, that grabs attention. The problem is that when you do that, you really better be able to prove it and, candidly, I hope that you've been asking yourselves the same question I have ever since opening argument.
>
> Where's Hondo? Where's Hondo? In opening statement you were told that Hondo is someone that wears black clothes all the time and carries a black powder pistol. That started bothering me when I started looking at the clothes that we know he was wearing during the murders; blue jeans and a blue shirt.
>
> Where's Hondo? That started bothering me even more when I started listening to the Defense talk about Hondo. What they say is he made a choice about acting in a role and, candidly, I think Tom Stowe perhaps said it best on cross examination. He said, "Hondo is Todd. They're the same person."
>
> So, ladies and gentlemen, that was an attempt to divert your attention – to try to create something sensational that will divert your attention from the facts.

(*Id.* at 9-10.) Finally, the prosecutor argued that the defense was using impulsivity to confuse the issues. In doing so, she contended that the defense experts were not impartial because two of them worked with a person who sat at the defense table assisting counsel and that they were financially motivated to provide testimony that favored the defendant. (*Id.* at 11.) She then went on to argue that Petitioner's behavior at the time of the offense established that the murders were premeditated, not impulsive.

The Court has carefully reviewed the entirety of the prosecutor's opening and rebuttal closing arguments and concludes that she neither denigrated defense counsel nor argued that his impulsivity defense was a sham. Rather, she criticized the defense's theory of the case and "attacked the strength of the defense on the merits, not the integrity of defense counsel."

*United States v. Bernard*, 299 F.3d 467, 487-88 (5th Cir. 2002) (rejecting a challenge to a prosecutor's closing argument that accused the defense of trying "to get someone on this jury to . . . take a red herring"); *see also United States v. Vazquez-Botet*, 532 F.3d 37, 56 -59 (1st Cir. 2008) (finding no misconduct where prosecutor characterized defense counsel as "desperate lawyers" seeking to "cloud the issues"); *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997) ("Criticism of defense theories and tactics is a proper subject of closing argument.").

The Court further concludes that the prosecutor did not engage in improper vouching for the government's case or its witnesses. Petitioner's argument rests almost entirely on the prosecutor's statements that Detective Rice "did an excellent job" and that the government had a "strong" case. (Dkt. 24 at 137-38.) Read in context, however, the comment about Detective Rice concerned the fact that he was able to quickly identify Todd Smith as the Tannehills' killer, a fact conceded by defense counsel in his opening statement. The prosecutor argued:

> It is now time for you to step into this case, to take your role and to render your verdict. As you do that, you should know that there is a lot of things you are not going to have to deliberate about or that you're not going to have to struggle with in this case, issues that do come up in other cases when the evidence isn't quite so strong.
>
> You see, unfortunately for the Defendant, Detective Mike Rice did an excellent job in this case. The Defense expert told you that. The fact of the matter is that the Sheriff's Department did a good job in moving on this case and processing evidence. The fact of the matter is we had citizens who were willing to get involved. We had citizens who were willing to tell us what they observed, citizens that were concerned about the welfare of others, and because of that, the State has an extraordinarily strong case.
>
> *Because of all of these things, we know who killed Joe and Elaine Tannehill. You're not going to have to go back in the jury room and struggle over whether or not Todd Smith did these murders. That's a done deal.*
>
> . . . .
>
> In a lot of cases we spend a lot of time and evidence trying to prove [identity], but that's something that we won't have to do in this case. We're also not debating about where the murders occurred, whether the bodies were moved, or which jurisdiction the murder occurred in, and it's also pretty clear what motivated the murders in this case. We have it right here (indicating).
>
> So despite everything and despite some of the confusion that has been

40

created in the end of the trial, the bottom line is this is a very, very strong case, and that's something that I want to talk about.

(RT 4/23/97 at 4-5.)

The statement that Detective Rice did "an excellent job" falls short of the type of vouching for the credibility of a witness that courts have found constitutionally invalid. *See United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) (prosecutor "deliberately introduced into the case his personal opinion of the witnesses' credibility" through comments such as, "I think he [the witness] was very candid"); *United States v. Shaw*, 829 F.2d 714, 717 (9th Cir. 1987) (finding vouching where prosecutor implied that he would be able to determine whether witness was testifying truthfully); *United States v. Roberts*, 618 F.2d at 533 (improper for prosecutor to tell jury that police were monitoring the trial to determine that witness testified truthfully). The prosecutor's comment that the State's case was "strong" neither offered personal assurances of the veracity of government witnesses, nor suggested that their testimony was supported by information not introduced as evidence. Rather, it was a reasonable inference from the evidence. *United States v. Drake*, 885 F.2d 323, 324 (6th Cir. 1989) ("The government is not forbidden to comment on the strength of its proofs; otherwise we take the 'argument' out of closing argument and reduce it to a flaccid resumé of the evidence."); s*ee also Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) ("Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom."); *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991) (prosecutors have wide latitude during closing argument to argue reasonable inferences based on the evidence).

Petitioner also complains that the prosecutor improperly vouched for its rebuttal expert, Dr. Pitt. Again, the Court disagrees. The prosecutor's comments with regard to Dr. Pitt were based on the evidence presented, not her personal opinion of his qualifications.

The Court concludes that the prosecutor's comments during closing argument did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due

process" as required for habeas relief under *Darden*. 477 U.S. at 181. The remarks "did not manipulate or misstate the evidence, nor did [they] implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Id.* at 182. Moreover, any potential prejudice resulting from the comments was ameliorated by the trial court's instruction, following closing arguments, that the jury was not to be "influenced by sympathy or prejudice" and that "what the lawyers said is not evidence." (ROA 189.)

Finally, the weight of the evidence against Petitioner was overwhelming. *Darden*, 477 U.S. at 182; *see Cook v. Schriro*, 538 F.3d 1000, 1021 (9th Cir. 2008) (finding no prejudice where it was clear jury would have returned guilty verdict notwithstanding prosecutor's comments). Petitioner argues repeatedly that this was a close case in terms of premeditation. Even assuming that were true, it was clearly a very strong case for felony murder. As instructed by the judge in this case, felony murder required proof of two things: (1) that Petitioner committed or attempted to commit armed robbery or burglary in the first degree, and (2) that in the course of and in furtherance of either of these felonies, Petitioner caused the victims' deaths. (ROA 189.) The judge further instructed that "in furtherance of" means that "the death resulted from an action taken to facilitate the accomplishment of one or more of the alleged felonies." (*Id.*) The evidence at trial established that Petitioner was in financial stress, that he created a ruse to get into the victims' trailer, that he was armed with two dangerous weapons, and that by his own confession he first severely beat the victims then rummaged through their trailer taking items of value before slitting their throats. This evidence overwhelmingly established that Petitioner killed the victims to facilitate the taking of their possessions. That there was little to defend on the felony murder charge is apparent from the fact that defense counsel's closing argument on this count comprised only two of 83 transcript pages and rested mainly on the theory that Petitioner did not need to kill the Tannehills in order to take their property. (RT 4/23/97 at 110-11.) Petitioner was not prejudiced by the prosecutor's allegedly improper closing arguments.

<u>Sympathy for Victims</u>

Prior to trial, defense counsel moved in limine to preclude the prosecution from

calling as rebuttal witnesses the victims' personal physicians to testify as to the Tannehills' physical limitations. (ROA 153.) Petitioner argued that such evidence was irrelevant because he was not asserting self-defense, only that he was struck by Mr. Tannehill, which caused Petitioner to fall backwards and triggered a reflexive rage. (*Id.* at 2.) The State disagreed, asserting that Mr. Tannehill was incapable of launching an attack on Petitioner severe enough to trigger an impulsive reaction. (RT 3/25/97 at 29.) At a pretrial hearing, the court determined:

> As far as the physical – actual physical capacity of Mr. Tannehill or Ms. Tannehill, if that also becomes an issue, the Court is going to reserve any decision on that pending the receipt of the testimony from either the Defense or the Defendant or the Defense experts, and if testimony is made – and I agree this is somewhat of a subjective evaluation. If too much is made of the victims having responded in a manner that, based upon what has been presented to me, is beyond their capacity, then I will allow it.

(*Id.* at 34.) In response to the prosecutor's request for guidance in light of anticipated testimony from the medical examiner and the fact that Mr. Tannehill used a cane, the court stated:

> I can understand the relevancy of, you know, premeditation, and I understand why the cane might be important and the defensive struggling and whether there was any marks on the Defendant's [sic] body. I understand those issues, but if you go too far and if you make this – and you know what I'm talking about – a sympathy case, then we're all flirting with having the Supreme Court tell us to do it over again, and nobody wants to do that.

(*Id.* at 39.)

In her opening statement, the prosecutor described the victims as nature lovers who, "[w]hen age and physical infirmity became obstacles for them, [] found ways to get around those obstacles so they could still come out and they could still have this experience." (RT 4/7/97 at 31.) In explaining what led to the discovery of the victims' bodies, she stated that Mr. Tannehill used a crutch which had been seen sitting outside the trailer for more than a day. (*Id.* at 35.) In describing how Mr. Tannehill died, the prosecutor relayed that as a result of brain surgery he had a prosthesis on his skull, which shattered when his head was beaten. (*Id.* at 45-46.)

At trial, the victims' daughter testified that her father had a weak left side as a result

of two strokes and used a crutch and leg brace. (*Id.* at 72.) The victims' grandson stated that he usually helped set up his grandparents' camp, as his grandfather had difficulty doing it alone. (*Id.* at 79, 83.) He further testified that his grandfather used a crutch and sometimes a wheelchair to get around. (*Id.* at 84-85.) On cross-examination, defense counsel questioned the victims' grandson about Mr. Tannehill's brain surgery and walking difficulties. (*Id.* at 88-90.) Defense counsel asked similar questions of fellow campers. (*Id.* at 104-07, 115.) In explanation to the court, defense counsel stated:

> [T]he State raised Joe Tannehill's feeble condition in their opening statement, Your Honor, so I'm attempting to work within the bounds of what we discussed prior to trial in terms of not turning this in – and what I said to the jury in my opening statement was that I'm not saying that either of these people did anything that anybody else would have done under the circumstances and that they did it in such a minor way. It's just that the way his brain works – Todd Smith's brain works, that small amount of physical provocation is what set him off, and almost every laywitness so far has testified on direct examination about how he was handicapped, how he couldn't get around, and all these things, and that was a lot of times unsolicited by the State. If I just leave that there, I would be remiss in not asking them about what he could do, because they're bringing this stuff out on their own.

(RT 4/8/97 at 135-36.)

The medical examiner testified in detail concerning Mr. Tannehill's physical condition, including his brain injury, skull fracture, artificial knee, and artificial hip. (RT 4/8/97 at 219-21.) He further noted that Mr. Tannehill had no defensive wounds. (*Id.* at 222.) During cross-examination of defense reconstruction expert James Jarrett, the prosecutor questioned Jarrett on the force necessary to support his theory of the events in the trailer and whether Mr. Tannehill was physically capable of exerting such force. (RT 4/18/97 at 71-72.) She also sought to question Jarrett about the prosthetic in the victim's skull. (*Id.* at 73.) This led to a defense objection and extensive bench conference during which the court noted that defense counsel was "trying to play both ends of this" because he had brought in a witness to talk about Mr. Tannehill's abilities. (*Id.* at 74.) The court ultimately ruled that the State could question Jarrett about the fact the prosthesis would shatter if hit with sufficient force but not about whether Petitioner knew the victim had the device. (*Id.* at 76-79.) The court also denied the State's renewed request for rebuttal testimony by Mr.

Tannehill's orthopedic surgeon. (RT 4/21/97 at 89-95.)  In closing argument, the prosecutor argued that Petitioner had picked out the victims because they were the "weakest people in the campground, people that were obviously going to have trouble putting up a fight."  (RT 4/23/97 at 20.)

Petitioner asserts that the prosecutor's introduction of evidence concerning the frail physical condition of the murdered couple was part of a "'well-planned theme' designed to play on the 'jurors' personal fears and emotions.'" (Dkt. 24 at 188.)  He argues that this evidence was irrelevant to his *Christensen* impulsivity defense and therefore was introduced solely to inflame the passions and prejudices of the jury. (*Id.* at 154.)  In addition to the victims' physical infirmities, he complains that the prosecution improperly admitted into evidence Mr. Tannehill's crutch and an "in life" photo of Mrs. Tannehill wearing one of the stolen necklaces, and improperly elicited other inadmissible and prejudicial information, including that Petitioner's mother was "afraid" of him, that the victims were not the kind of people to abandon their pet, and the emotional state of the first responding officers and campground hosts upon discovering the victims' bodies. (*Id.* at 178, 192-95.)

For several reasons, the Court concludes that Petitioner's fair trial rights were not violated when the prosecutor presented this evidence. *See DeChristoforo*, 416 U.S. at 643. First, the prosecutor did not act improperly because the challenged evidence was relevant. Evidence of the victims' frailties supported the prosecution's premeditation theory that Petitioner selected the Tannehills because they were vulnerable targets.  It also countered the defense theory that Mr. Tannehill's physical struggle with Petitioner triggered reflexive, impulsive behavior and was thus relevant to the question of whether Petitioner premeditated his lethal attack.  The fact that Mr. Tannehill used a crutch was also relevant both as to premeditation – Petitioner likely saw him with the crutch and may have concluded he would not resist – and to explain how the bodies were eventually discovered.  Similarly, the photograph of Mrs. Tannehill was relevant to identification of the stolen necklace. Petitioner complains that these facts had already been established and thus the exhibits were unnecessary, but that does not eliminate their relevancy.  The testimony from the

campground host that Petitioner's mother said she was afraid of her son was not offered for the truth of the statement but for the campground host's state of mind and was relevant to explain why the host believed Petitioner and his mother had engaged in a scam for gasoline and cash; this laid the foundation for explaining how and why the campground hosts shared their concerns about Petitioner to other hosts, which ultimately contributed to the identification of Petitioner's motor home. (*See* RT 4/8/97 at 15-17.) The testimony that the victims were not "the kind of people to walk off and leave an animal in a trailer" was in response to the prosecutor's questions about the timing of events that led to discovery of the victims and was clearly relevant to explain why the host called law enforcement after hearing their dog barking. (*Id.* at 25.) The emotional states of the persons discovering the bodies was relevant to explain any discrepancies in their testimony concerning the crime scene.

Second, nothing in either the prosecutor's opening statement or closing arguments can be read as a blatant appeal to the emotions of the jury or an attempt to elicit sympathy for the victims. *Cf. Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (finding improper prosecutor's assertion in closing argument that victim "was a gentle man who did nothing to deserve his dismal fate"); *Miller v. Lockhart*, 65 F.3d 676, 683-84 (8th Cir. 1995) (finding improper prosecutor's "interwoven theme" in capital penalty trial argument that jurors and their families were at risk if defendant not sentenced to death). Finally, Petitioner was not prejudiced from any of the alleged improprieties in the State's case because there was overwhelming evidence of his guilt and no reasonable probability exists that, absent the complained of testimony and exhibits, the result of the trial would have been different.

Rebuttal Evidence

Petitioner argues that the prosecutor engaged in misconduct by introducing expert rebuttal evidence that was improper and highly prejudicial. (Dkt. 24 at 195.) He asserts that Dr. Pitt violated the rule in *Christensen* by testifying about Petitioner's state of mind at the time of the offense and impermissibly relayed that Petitioner had been a drug dealer. (*Id.* at 200, 209.) The Court disagrees.

First, Petitioner mischaracterizes Dr. Pitt's testimony. The expert at no point opined

as to Petitioner's state of mind at the time of the offense. He opined generally that a person with an impulsive personality is nonetheless capable of reflecting on his or her actions. (RT 4/22/97 at 49.) With regard to Petitioner specifically, he stated that an inability to plan was one of the traits of Petitioner's antisocial personality disorder, but that Petitioner had the ability to premeditate. (*Id.* at 53-55.) Finally, Dr. Pitt described in general terms the factors one would consider in evaluating a person's state of mind at the time of an offense:

> A.  Well, again, keep in mind that it's a retrospective analysis of an event that occurred somewhere back in time. Surely reviewing the discovery material, interviewing the Defendant when possible, looking at the behavior of the offender during the carrying out of the act or acts, the method of operation in which the act or acts were carried out, what weapon or weapons were used during the commission of the act or acts, and understanding – an understanding of psychological profile or psychiatric profile of the offender, an understanding of the victim or victims and their psychological profiles so that you understand the mix between offender and victim, seeing if any things were taken from the place where the offense occurred, was there an effort to conceal or hide or dispose of a weapon or weapons or garments that were worn during the commission of the offense or offenses, was there an effort to change one's appearance or was there an effort – and in so-doing, to evade apprehension; those would be some of [the] things that you would want to look at.

> Q:  So bottom line, you look at the actual behavior, itself?

> A:  Yes. You have to understand the behavior to understanding everything that happened.

(*Id.* at 56-57.) Nothing in this testimony amounts to an opinion on whether Petitioner was acting impulsively and without premeditation when he killed the Tannehills. Rather, Dr. Pitt provided an overview of factors that could be considered in reaching this issue.[10]

Second, Petitioner erroneously states that prior to Dr. Pitt's testimony "there had been no testimony characterizing Mr. Smith as one who sold illegal drugs." (Dkt. 24 at 209.) In fact, defense counsel elicited from Dr. Gaughan during direct examination that Petitioner "has led a fairly marginal existence as far as his drug use, his relationships, *his expectations of interactions with others by dealing drugs*, things like that." (RT 4/17/97 at 129 (emphasis

---

[10]  The prosecution elicited similar responses from defense experts Drs. Raine and Sindelar. (RT 4/18/97 at 182; RT 4/21/97 at 76.)

added).) In addition, the trial court expressly found that defense counsel had opened the door to Dr. Pitt's testimony by going "into the drug issue very heavily" (RT 4/10/97 at 106), and instructed the jury not to consider evidence of other acts of Petitioner "to prove the defendant's character or that the defendant acted in conformity with that character" (ROA 189).

Even if the other act evidence was improperly injected into trial by the prosecutor, Petitioner has not shown that the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *DeChristoforo*, 416 U.S. at 643. There was overwhelming evidence of Petitioner's guilt; thus, no reasonable probability exists that the result of the trial would have been different had Dr. Pitt not testified concerning Petitioner's history of drug dealing.

<u>Invocation of Right to Counsel</u>

At trial, the prosecutor elicited from Detective Rice the fact that Petitioner had invoked his right to counsel during his initial interview of Petitioner at the Phoenix police station. (RT 4/15/97 at 149-50.) Petitioner's invocation was also left in the recording and transcript of the statement provided to the jury. Petitioner argues that the prosecutor's questioning of Detective Rice and her failure to redact the invocation violated his right to due process under *Doyle v. Ohio*, 426 U.S. 610 (1976), and *Wainwright v. Greenfield*, 474 U.S. 284 (1986). The Court disagrees.

The prosecution may not use a defendant's post-arrest, post-*Miranda* silence either to impeach his testimony at trial, *see Doyle*, 426 U.S. at 619, or as evidence of guilt during the State's case-in-chief, *see Greenfield*, 474 U.S. at 292. Reference to the accused's post-*Miranda* silence is impermissible because it is fundamentally unfair for the government to induce silence through *Miranda* warnings and then later use that silence against the accused. *See Doyle*, 426 U.S. at 617-18. However, when the accused waives his right to remain silent and agrees to questioning, no such inducement has occurred. *Anderson v. Charles*, 447 U.S. 404, 408 (1980) (per curiam) ("a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent").

In this case, Petitioner did not choose to remain silent after receiving *Miranda* warnings. *See Anderson*, 447 U.S. at 408; *McKenna v. McDaniel*, 65 F.3d 1483, 1491-92 (9th Cir. 1995) (no *Doyle* error where defendant did not remain silent). Moreover, there was no extensive comment on Petitioner's invocation of his right to counsel, and an inference of guilt from this invocation was in no way stressed to the jury as a basis for conviction. *Cf. State v. Keeley*, 178 Ariz. 233, 235, 871 P.2d 1169, 1171 (1994) (finding *Doyle* error where "the jury was advised by the State in opening statement that Appellant's invocation of his right to remain silent was 'significant' evidence of Appellant's guilty state of mind); *State v. Sorrell*, 132 Ariz. 328, 330, 645 P.2d 1242, 1244 (1982) (finding *Doyle* error where prosecution argued as evidence of guilt fact that defendant initially invoked right to silence and then voluntarily made statement after having "time to think about what he was going to say to officers"). The Court also notes that defense counsel referenced the fact that Petitioner had invoked his right to counsel as part of his closing argument that Petitioner's statements while in transit to Flagstaff were not voluntary. (RT 4/23/97 at 116-17.) In light of the overwhelming evidence against Petitioner, the Court finds that any alleged error did not have a substantial and injurious effect on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (adopting harmlessness standard for *Doyle* error). In addition, the Court finds that the prosecutor's elicitation of Detective Rice's testimony and failure to redact Petitioner's statement did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. *See Darden*, 477 U.S. at 181.

Shifting Burden of Proof

During trial, the prosecution elicited from its DNA expert testimony that samples are available for re-testing by the defense. (RT 4/15/97 at 71.) Similarly, Detective Rice testified that items of evidence are preserved "in case the Defense team down the line wants to look at them"; such evidence in this case included tire tracks and blood from the victims' trailer. (*Id.* at 84; RT 4/16/97 at 15.) After the State rested, defense counsel elicited from a witness the fact that the crime lab did not analyze shoe or finger prints from the crime scene. (RT 4/17/97 at 16-17, 20.) On cross-examination, this witness testified that

49

defendants are not prohibited from getting evidence analyzed by their own experts or labs. (*Id.* at 19.)

Petitioner complains that the prosecutor "repeatedly implied that the defense had a reciprocal burden of testing or affirmatively accessing state's evidence in order to *disprove* the state's claims." (Dkt. 24 at 223.) He argues, without citation to controlling authority, that it "is a violation of due process for a prosecutor to induce the jury to infer guilt – whether the point is actually argued or not – from a defendant's decision not to collect, test, or present evidence on his own behalf." (*Id.*)

"A prosecutor's comment on a defendant's failure to call a witness does not shift the burden of proof, and is therefore permissible, so long as the prosecutor does not violate the defendant's Fifth Amendment rights by commenting on the defendant's failure to testify." *United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000). In addition, a "comment on the failure of the *defense* as opposed to the *defendant* to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's Fifth Amendment privilege." *United States v. Wasserteil*, 641 F.2d 704, 709-10 (9th Cir. 1981).

Here, nothing elicited at trial concerning the availability of evidence to the defense can be construed as a comment on Petitioner's failure to testify. Moreover, the defense questioned the State's failure to test shoe and finger prints found at the crime scene (*see* RT 4/23/97 at 78, 89); therefore, this evidence was relevant. Finally, in light of the overwhelming evidence of Petitioner's guilt, there is no reasonable probability the result of the trial would have been different had this evidence not been admitted. Petitioner has not shown that the prosecutor's actions were improper or that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *DeChristoforo*, 416 U.S. at 643.

Ineffective Assistance of Counsel

In light of the Court's analysis above – finding the alleged instances prosecutorial misconduct either not improper or plainly harmless – Petitioner has not shown trial counsel's failure to object to the alleged misconduct or appellate counsel's failure to raise prosecutorial

misconduct claims on appeal to be objectively unreasonable under *Strickland*. In addition, given the strength of the case against him, he has not demonstrated that he was prejudiced by trial or appellate counsel's performance.

#### Conclusion

The Court finds that Petitioner's individual claims of prosecutorial misconduct fail. The Court also concludes that, considered cumulatively, the totality of the allegations does not establish entitlement to habeas relief. Finally, the Court finds that neither trial nor appellate counsel were ineffective for failing to object or raise these allegations on appeal.

### Claim 5:    Ineffective Assistance of Appellate Counsel

Petitioner asserts that appellate counsel was ineffective for failing to present in his state appellate brief the substantive issues contained in Claims 2-4 of his First Amended Petition for Writ of Habeas Corpus. (Dkt. 24 at 237.) In its order of March 26, 2006, the Court determined that ineffective assistance based on the failure to raise Claim 2 on appeal was plainly meritless and that the prosecutorial misconduct allegations identified as subparts A, B, C, D, E, and G in Claim 3 and the untimely disclosure issue set forth in Claim 4 were appropriate for merits review. (Dkt. 64 at 18.) The Court has addressed these specific allegations above and found that appellate counsel was not constitutionally ineffective. (*Id.*) However, Petitioner also raises "a general claim of ineffective assistance of appellate counsel." (Dkt. 24 at 237.)

The Fourteenth Amendment guarantees a criminal defendant the right to effective assistance of counsel on his first appeal. *Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985). A claim of ineffective assistance of appellate counsel is reviewed according to the standard in *Strickland*, 466 U.S. at 687-88. Under *Strickland*, a petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's deficient performance, the petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). "A failure to raise untenable issues on appeal does not fall below the *Strickland* standard," *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002); nor does appellate counsel have a constitutional duty to

raise every nonfrivolous issue requested by a petitioner. *Miller v. Keeney*, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989) (citing *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983)).

Petitioner argues, without citation of authority, that the principle of "weeding out" weaker issues "has little or no applicability in capital cases." (Dkt. 24 at 237.) He further asserts that the direct appellate briefing in this case "is sub-standard on its face" and that the reply brief "is non-existent." (*Id.* at 239.) The Court declines to find that appellate counsel's representation was deficient simply because he did not raise every nonfrivolous claim identified by habeas counsel. Moreover, Petitioner cannot establish prejudice from this "general" allegation of ineffectiveness.

### Claim 7: Pecuniary Gain Aggravating Factor

Petitioner argues that the trial court erred in finding the pecuniary gain aggravating factor under A.R.S. § 13-703(F)(5), in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments. (Dkt. 24 at 310.) In its March 21, 2006 order, the Court determined that this claim was exhausted on direct appeal by the Arizona Supreme Court's independent sentencing review. (Dkt. 64 at 19-20.)

With respect to state court application of an aggravating factor, habeas review "is limited, at most, to determining whether the state court's finding was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). In making that determination, the reviewing court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found that the factor had been satisfied." *Id.* at 781 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Under Arizona law, "a finding that a murder was motivated by pecuniary gain for purposes of § 13-703(F)(5) must be supported by evidence that the pecuniary gain was the impetus of the murder, not merely the result of the murder." *Moormann v. Schriro*, 426 F.3d 1044, 1054 (9th Cir. 2005). The trial court found that the factor was satisfied based on the evidence that Petitioner went to the victims' trailer armed with a gun and large knife with the intent to rob them, that he had no job and no money, and that he could have robbed the

Tannehills without killing them.  (ME 67 at 3-4.)  On independent sentencing review, the

Arizona Supreme Court agreed:

> It is undisputed that Smith came to rob the Tannehills.  He admits this in his Opening Brief, Appellant's Opening Br. at 13, and in closing argument he admitted that he premeditated the robbery.  Tr. of Apr. 23, 1997, at 66. Smith did not kill the Tannehills and then decide to rob them as an afterthought.  He came to rob, and his desire for pecuniary gain infected his conduct. *See LaGrand,* 153 Ariz. at 35, 734 P.2d at 577.  Smith attacked them and, by his own account, killed them when he believed they were resisting his attempts to rob them.  Mr. Tannehill was disabled and used a cane.  Smith was considerably larger than both victims, was armed with two weapons, and had already beaten them.
>
> Smith argues that his only motive was to rob and the murders occurred only after the victims resisted.  He does not offer any authority to support his argument that when victims resist a robbery and are killed for it, pecuniary gain does not exist.  Smith wanted the Tannehills' property and he killed them to get it.  The evidence supports the finding of pecuniary gain for both murders beyond a reasonable doubt.

*Smith*, 193 Ariz at 461, 974 P.2d at 440.

Viewed in the light most favorable to the State, there was sufficient evidence to establish that Petitioner sought to rob the Tannehills.  "Murdering a person to facilitate a robbery and escape constitutes murdering for pecuniary gain." *State v. Mann*, 188 Ariz. 220, 227, 934 P.2d 784, 791 (1997).  There is no competing evidence suggesting a motive for the murders other than the expectation of pecuniary gain. *Compare State v. LaGrand*, 153 Ariz. 21, 35, 734 P.2d 563, 577 (1987) ("When the defendant comes to rob, the defendant expects pecuniary gain and this desire infects all other conduct of the defendant.") *with State v. Wallace*, 151 Ariz. 362, 368, 728 P.2d 232, 238 (1986) (insufficient evidence to support pecuniary gain aggravating factor where defendant's motive was relationship difficulties with the victim and the taking of money and keys was incidental to the murder).  Based upon the evidence admitted at trial, a rational factfinder could have determined that the Tannehills were murdered in the expectation of pecuniary gain and that Petitioner was motivated by the expectation of such gain. *See Correll v. Stewart*, 137 F.3d 1404, 1420 (9th Cir. 1998); *Woratzeck v. Stewart*, 97 F.3d 329, 336 (9th Cir. 1996).  Therefore, Petitioner is not entitled to relief on Claim 7.

**Claim 8:    Jury Determination of Aggravating Factors**

Petitioner alleges that Arizona's statutory death penalty scheme is unconstitutional because it (1) allowed a judge, not a jury, to find the aggravating circumstances that rendered him death-eligible, (2) failed to require the state to provide notice of aggravating circumstances in the indictment, and (3) lacked "accuracy-enhancing protections" such as non-exposure to inadmissible, prejudicial information as well as the opportunity to voir dire the sentencing judge. (Dkt. 24 at 320-25.)  Respondents concede that these allegations were properly exhausted in state court. (Dkt. 32 at 74.)

In support, Petitioner relies primarily on *Ring v. Arizona*, 536 U.S. 584, 609 (2002), which found that Arizona's aggravating factors are an element of the offense of capital murder and therefore must be found by a jury.  However, subsequently, in *Schriro v. Summerlin*, 542 U.S. 348 (2004), the Court held that *Ring* does not apply retroactively to cases already final on direct review.  Because direct review of Petitioner's case was final prior to *Ring*, he is not entitled to federal habeas relief premised on that ruling.

With regard to his indictment claim, the Supreme Court has held that facts constituting the elements of an offense rather than just a sentencing enhancement must be charged in a *federal* indictment.  *See Jones v. United States*, 526 U.S. 227, 252 (1999).  However, the Fifth Amendment Due Process Clause does not incorporate the same requirements upon state criminal prosecutions by virtue of the Fourteenth Amendment.  *See Hurtado v. California*, 110 U.S. 516, 538 (1884); *Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972).  Therefore, states are not required by the Constitution to empanel grand juries for purposes of indictment. *Id.*  Based on these same principles, a similar argument has been rejected by the Arizona Supreme Court, which held that the federal constitution does not require that aggravating factors be alleged in an indictment and supported by probable cause.  *See McKaney v. Foreman*, 209 Ariz. 268, 270, 100 P.3d 18, 20 (2004).  This Court agrees.

Finally, the Court finds no constitutional violation resulting from the fact that judges, and the sentencer in pre-*Ring* cases, are exposed to inadmissible and prejudicial information or that Petitioner was unable to voir dire the sentencing judge.  Although the Constitution

requires that a defendant receive a fair trial before a fair and impartial judge with no bias or interest in the outcome, *see Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997), trial judges, like other public officials, operate under a presumption that they properly discharge their official duties. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996); *see also State v. Perkins*, 141 Ariz. 278, 286, 686 P.2d 1248, 1256 (1984) (trial judge is presumed to be free of bias and prejudice). The presumption of regularity applies to trial judges, absent clear evidence to the contrary. *See Armstrong*, 517 U.S. at 464; *see also State v. Rossi*, 154 Ariz. 245, 248, 741 P.2d 1223, 1226 (1987) (mere possibility of bias or prejudice does not entitle a criminal defendant to voir dire the trial judge at sentencing). The Arizona Supreme Court's denial of Claim 8 was neither contrary to nor an unreasonable application of controlling federal law.

**Claim 9:        Heinous, Cruel or Depraved Aggravating Factor**

Petitioner argues that the trial court erred in finding the "especially heinous, cruel or depraved" aggravating factor under A.R.S. § 13-703(F)(6) and that the factor is unconstitutionally vague, in violation of his rights under the Sixth, Eighth and Fourteenth Amendments. (Dkt. 24 at 326.) Respondents contend that the claim is procedurally barred because Petitioner did not present the federal basis of the claim on direct appeal. (Dkt. 32 at 75.) Petitioner responds that the federal constitutional basis of the claim is "implicit" and alleges ineffective assistance of appellate counsel as cause for any procedural default. (Dkt. 37 at 95-102.)

On appeal, Petitioner argued only that the sentencing court erred under Arizona law in determining that the murders were committed in an especially heinous, cruel or depraved manner. Because he did not cite a federal basis for the claim, it was not fairly presented to the state supreme court. *See Baldwin v. Reese*, 541 U.S. 27 (2004). However, the Arizona Supreme Court considered the (F)(6) aggravating factor during its independent sentencing review. *Smith*, 193 Ariz at 461-62, 974 P.2d at 440-41. This Court must determine whether that review exhausted the claim.

The Arizona Supreme Court independently reviews each capital case to determine whether the death sentence is appropriate. In *State v. Gretzler,* 135 Ariz. 42, 54, 659 P.2d

1, 13 (1983), the court stated that the purpose of independent review is to assess the presence
or absence of aggravating and mitigating circumstances and the weight to give to each. To
ensure compliance with Arizona's death penalty statute, the state supreme court reviews the
record regarding aggravation and mitigation findings and decides independently whether the
death sentence should be imposed. *State v. Brewer*, 170 Ariz. 486, 493-94, 826 P.2d 783,
790-91 (1992). The Arizona Supreme Court has also stated that in conducting its review it
determines whether the sentence of death was imposed under the influence of passion,
prejudice, or any other arbitrary factors. *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41,
51 (1976), *sentence overturned on other grounds, Richmond v. Cardwell*, 450 F.Supp. 519
(D. Ariz. 1978). Arguably, such a review rests on both state and federal grounds. *See
Brewer*, 170 Ariz. at 493, 826 P.2d at 790 (finding that statutory duty to review death
sentences arises from need to ensure compliance with constitutional safeguards imposed by
the Eighth and Fourteenth amendments).

While the state court's independent review does not encompass any and all alleged
constitutional error at sentencing, the Court must determine if it encompassed Petitioner's
claim that the trial court erred in finding the (F)(6) aggravating factor. In its written opinion,
the Arizona Supreme Court reviewed the aggravating factors found by the sentencing judge
to independently determine their existence and whether a death sentence was appropriate.
*Smith*, 193 Ariz at 460-62, 974 P.2d at 439-41. With respect to the especially heinous, cruel
or depraved factor, the supreme court reviewed the evidence in the record and determined
that this factor had been satisfied. *Id.* at 461-62, 974 P.2d at 440-41. The supreme court's
actual review of the trial court's finding of the (F)(6) factor sufficiently exhausted Claim 9.
*See Sandstrom v. Butterworth*, 738 F.2d 1200, 1206 (11th Cir. 1984). Thus, the Court finds
that Claim 9 was actually exhausted, and it will be reviewed on the merits.


Analysis

In *Walton v. Arizona*, the Supreme Court found Arizona's heinous, cruel or depraved
aggravating factor to be facially vague, but held that Arizona courts had sufficiently

56

narrowed their application of the factor so as to constitutionally channel a sentencer's discretion. 497 U.S. 639, 654 (1990); *see also Jeffers*, 497 U.S. at 777-81. Therefore, this aspect of Petitioner's claim is plainly meritless, and the Court's review is limited to assessing whether the state court's application of the (F)(6) factor was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation. *Jeffers*, 497 at 780.

Arizona's (F)(6) aggravating factor, phrased in the disjunctive, is satisfied if the murder is either especially heinous, or cruel, or depraved. *State v. Murray*, 184 Ariz. 9, 37, 906 P.2d 542, 570 (1995). The especially cruel prong is satisfied "if the victim consciously experienced physical or mental pain and suffering prior to dying." *State v. Lopez*, 174 Ariz. 131, 143, 847 P.2d 1078, 1090 (1992). Evidence about "[a] victim's certainty or uncertainty as to his or her ultimate fate can be indicative of cruelty and heinousness." *State v. Gillies*, 142 Ariz. 564, 569, 691 P.2d 655, 660 (1984); *see also State v. Kemp*, 185 Ariz. 52, 65, 912 P.2d 1281, 1294 (1996). Cruelty also exists where a victim witnesses the killing of a family member before she herself is killed. *State v. Kiles*, 175 Ariz. 358, 371, 857 P.2d 1212, 1225 (1993).

The trial court found that the State had proven cruelty beyond a reasonable doubt with respect to Mrs. Tannehill, but not her husband. Referencing Petitioner's statements to police that initially he had only knocked her down and the fact that she had defensive wounds, the court concluded that Mrs. Tannehill had to have been in fear for her own life as well as the life of her husband. (ME 67 at 4-5.) The Arizona Supreme Court concurred with the trial court's findings:

> Smith characterizes the trial court's finding of cruelty as speculative. We disagree. As the trial court stated, "[t]here had to have been sheer terror in her mind as she experienced the Defendant's attacks on her and her husband." Sp. Verdict at 5. Mrs. Tannehill watched her elderly, disabled husband try to defend them by grabbing at Smith's gun, which then fired. She saw Smith beat her husband with the gun before she herself was beaten. Using Smith's own version of the facts, he struck her again when he saw she was getting up from the first beating. This evidence, combined with defensive wounds, supports a finding of cruelty as to Mrs. Tannehill.

*Smith*, 193 Ariz at 461-62, 974 P.2d at 440-41.

Viewed in the light most favorable to the State, there was sufficient evidence to show

that Mrs. Tannehill suffered mental anguish and physical pain prior to death. Based upon the evidence admitted at the trial, a rational factfinder could have determined that the murder of Mrs. Tannehill was especially cruel because she struggled with her attacker, suffered uncertainty as to her fate, witnessed the murder of her disabled husband, and because Petitioner reasonably would have foreseen her suffering. Accordingly, Petitioner is not entitled to relief on Claim 9.

### Claim 10:     Age of Victim as Aggravating Factor

Petitioner contends that A.R.S. § 13-703(F)(9), which provides that murder of a person over the age of seventy constitutes an aggravating factor, is unconstitutional because it "creates a *per se* category of murder that is impossible to defend against." (Dkt. 24 at 336.) Respondents assert that the federal basis of this claim was never fairly presented in state court and is now procedurally barred. Regardless, the Court will address the claim because it is plainly meritless. *See* 28 U.S.C. § 2254(b)(2); *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

In denying relief on this claim, the Arizona Supreme Court stated:

> We find that age of a victim is an appropriate aggravating factor because a rational basis exists for it. By adopting the (F)(9) factor, the legislature determined that the young and old are especially vulnerable and should be protected. It is not irrational for the legislature to conclude that murders of children and the elderly are more abhorrent than other first-degree murders. Thus, in the absence of sufficient mitigating factors, murders of this sort should be punished more severely. In addition, the age of the victim is relevant to an inquiry into the defendant's characteristics and propensities. Those who prey on the very young or the very old are more dangerous to society.

*Smith*, 193 Ariz at 462, 974 P.2d at 441.

"An aggravating factor that exists in nearly every capital case fails to fulfill its purpose of guiding the jury in distinguishing 'those who deserve capital punishment from those who do not.'" *Tuilaepa v. California*, 512 U.S. 967, 991 (1994) (quoting *Arave v. Creech,* 507 U.S. 463, 474 (1993)). Applying this standard, Arizona's (F)(9) factor is constitutionally sufficient. First, it does not apply to every defendant convicted of murder, but only to a certain subclass of defendants. *See id.*, 512 U.S. at 972; *see also Styron v.*

*Johnson*, 262 F.3d 438, 451 (5th Cir. 2001) (holding that victim's age sufficiently narrow aggravating factor). Second, it is not unconstitutionally vague; it refers to a clear and definite category, similar to aggravating factors based on the victim's status as a law enforcement or corrections officer. *See Roberts v. Louisiana*, 431 U.S. 633, 636 (1977) (holding that a murder victim's status as a peace office performing regular duties constitutes permissible aggravating factor). The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of controlling federal law.

### Claim 11:     Mandatory Death Penalty

Petitioner contends that Arizona's capital sentencing scheme "does not sufficiently channel the sentencer's discretion." (Dkt. 24 at 338.) He also argues that the "mandatory" nature of Arizona's death penalty scheme improperly limits the sentencer's discretion. *Id.* at 342. Respondents assert that this claim was not fairly presented in state court and is now procedurally barred. Regardless, the Court will address the claim because it is plainly meritless. *See* 28 U.S.C. § 2254(b)(2); *Rhines*, 544 U.S. at 277.

Rulings of both the Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors do not adequately narrow the sentencer's discretion. *See Jeffers*, 497 U.S. at 774-77; *Walton*, 497 U.S. at 649-56; *Woratzeck*, 97 F.3d at 335. The Ninth Circuit has also explicitly rejected the contention that Arizona's death penalty statute is unconstitutional because it "does not properly narrow the class of death penalty recipients." *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998).

In *Walton*, the Supreme Court rejected the argument that "Arizona's allocation of the burdens of proof in a capital sentencing proceeding violates the Constitution." 497 U.S. at 651. *Walton* also rejected the claim that Arizona's death penalty statute is impermissibly mandatory and creates a presumption in favor of the death penalty because it provides that the death penalty "shall" be imposed if one or more aggravating factors are found and mitigating circumstances are insufficient to call for leniency. *Id.* at 651-52 (citing *Blystone v. Pennsylvania*, 494 U.S. 299 (1990), and *Boyde v. California*, 494 U.S. 370 (1990)); *see*

*Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006) (relying on *Walton* to uphold Kansas's death penalty statute, which directs imposition of the death penalty when the state has proved that mitigating factors do not outweigh aggravators); *Smith*, 140 F.3d at 1272 (summarily rejecting challenges to the "mandatory" quality of Arizona's death penalty statute and its failure to apply the beyond-a-reasonable-doubt standard).

**Claim 12:     Prosecutorial Discretion to Seek Death**

Petitioner asserts that Arizona's capital sentencing statute impermissibly allows the prosecutor unfettered discretion in determining whether to seek the death penalty. (Dkt. 24 at 343-45.) Respondents contend that this claim was not fairly presented in state court and is now procedurally barred. (Dkt. 32 at 85.) The Court will address the claim because it is plainly meritless. *See* 28 U.S.C. § 2254(b)(2); *Rhines*, 544 U.S. at 277.

Prosecutors have wide discretion in making the decision whether to seek the death penalty. *See McCleskey v. Kemp*, 481 U.S. 279, 296-97 (1987); *Gregg v. Georgia*, 428 U.S. 153, 199 (1976) (pre-sentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional). In *Smith*, the Ninth Circuit rejected the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty." 140 F.3d at 1272.

**Claim 13:     Conduct While Incarcerated**

Petitioner argues that he is being denied the opportunity to claim that his conduct on death row merits a sentence less than death. (Dkt. 24 at 345-48.) Respondents assert that the federal basis of this claim was not fairly presented in state court and is now procedurally barred. (Dkt. 32 at 88.) Again, the Court will address the claim because it is plainly meritless. *See* 28 U.S.C. § 2254(b)(2); *Rhines*, 544 U.S. at 277.

The Supreme Court has held that a capital defendant has a right to present as mitigation evidence of good behavior in jail prior to sentencing. *Skipper v. South Carolina*, 476 U.S. 1, 6 (1986). However, the Court has never held that defendants have an unlimited right to seek resentencing based on post-sentencing behavior in prison.

**Claim 17:    Clemency Proceeding**

Petitioner alleges that his constitutional rights will be violated because he will not receive a fair clemency proceeding. (Dkt. 24 at 361.) In particular, he alleges the proceeding will not be fair and impartial based on the Clemency Board's selection process, composition, training and procedures, and because the Attorney General will act as the Board's legal advisor and as an advocate against Petitioner. (*Id.*)

This claim is not cognizable on federal habeas review. Habeas relief can only be granted on claims that a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner's challenge to state clemency procedures and proceedings does not represent an attack on his detention – i.e., his conviction or sentence – and thus does not constitute a proper ground for relief. *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam); *see also Woratzeck v. Stewart*, 118 F.3d 648, 653 (9th Cir. 1997) (per curiam) (clemency claims are not cognizable under federal habeas law).

**Claim 19:    Competency for Execution**

Petitioner alleges that he will not be competent to be executed. (Dkt. 24 at 379.) Respondents assert this allegation is not ripe and is premature for federal review. (Dkt. 32 at 94.) Pursuant to *Martinez-Villareal v. Stewart*, 118 F.3d 628, 634 (9th Cir. 1997), *aff'd*, 523 U.S. 637 (1998), a claim of incompetency for execution raised in a first habeas petition, "must be dismissed as premature due to the automatic stay that issues when a first petition is filed." If again presented to the district court once the claim becomes ripe for review, it shall not be treated as a second or successive petition. *See id.* at 643-44; *Panetti v. Quarterman*, 551 U.S. 930, 947 (2007). Therefore, the Court will dismiss Claim 19 without prejudice as premature.

## CONCLUSION

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims.

# **CERTIFICATE OF APPEALABILITY**

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce resources that might be consumed drafting and reviewing an application for a certificate of appealability ("COA") to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a COA or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claims 3 and 6. For the reasons stated in this Order, and in the Court's Order of March 21, 2006 (Dkt. 64), the Court declines to issue a COA with respect to any other claims or procedural issues.

Based on the foregoing,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus, (Dkt. 24) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on September 22, 2003 (Dkt. 3) is **VACATED**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as to the following issues:

Whether Petitioner is entitled to relief on Claim 3, alleging prosecutorial misconduct in violation of the Fourteenth Amendment; and

Whether Petitioner is entitled to relief on Claim 6, alleging that his statements were obtained in violation of the Fifth, Sixth, and Fourteenth Amendments.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 3rd day of December, 2009.

_____
Susan R. Bolton
United States District Judge