**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Todd Lee Smith,<br><br>               Petitioner,<br><br>v.<br><br>Charles L. Ryan, et al.,<br><br>               Respondents. | No. CV-03-01810-PHX-SRB<br><br>**ORDER**<br><br><u>DEATH PENALTY CASE</u> |

This case is before the Court on remand from the Ninth Circuit Court of Appeals.

Petitioner Todd Lee Smith is an Arizona death row inmate. On December 3, 2009, this Court denied his amended petition for writ of habeas corpus. (Docs. 70, 71.) On December 1, 2014, the Ninth Circuit Court of Appeals remanded the case, ordering this Court to reconsider several of Smith's habeas claims in the light of intervening law, including *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014). (*See* Doc. 80.) On November 22, 2016, the Ninth Circuit expanded the remand to include a question as to the applicability of *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc), to Smith's sentencing. (*See* Doc. 95.) Both sets of remanded issues have been fully briefed. (Docs. 87, 88, 91, 97, 99, 104.)

Also before the Court is Smith's Motion to Stay Proceedings. (Doc. 106.) The request is based on the United States Supreme Court's grant of certiorari in *McKinney*. *See McKinney v. Arizona*, No. 18-1109, — S. Ct. —, 2019 WL 936074 (Mem). Respondents oppose a stay. (Doc. 107.)

# BACKGROUND

In 1997, a Coconino County jury convicted Smith of two counts of first-degree murder, armed robbery, and first-degree burglary arising from the robbery and deaths of an elderly couple at a campground in Ashurst Lake, Arizona. The Arizona Supreme Court summarized the facts of the crimes as follows:

> During the summer of 1995, Clarence "Joe" Tannehill, 72, and Elaine, his 73-year-old wife, were camping near Ashurst Lake, approximately twenty miles from Flagstaff. They arrived at the campsite in their truck and travel trailer on July 26, 1995.
>
> Todd Lee Smith arrived at the Ashurst campground on July 21, 1995 with his mother, Judy Smith, and four-year-old son in a motor home and car. The three were living in the motor home. Smith had been unemployed for some time and Judy supported all three with her Social Security income.
>
> On July 31, 1995, after a quarrel, the Smiths left Ashurst separately. Later that same day, Todd Smith and his son returned to Ashurst in the motor home. He had no money. When he arrived, he checked in and gave the campground hosts the name "Tom Steel" and an incorrect license plate number.
>
> The next evening, August 1, Smith went to the Tannehills' trailer armed with a gun and knife. His hand was wrapped in his son's T-shirt to feign an injury as a ruse to get into the trailer. Once Smith was inside, Mr. Tannehill grabbed for the gun and it went off. Smith then struck the Tannehills repeatedly with the gun. Although both had already died from blunt-force head injuries, he also cut their throats. Mrs. Tannehill also had bruises and lacerations on her arms and upper body, which the medical examiner characterized as defensive wounds.
>
> Smith took Mr. Tannehill's wallet from his back pocket and emptied Mrs. Tannehill's purse on the bed. He took cash, but left credit cards. He also took a white television set, seven necklaces, and approximately $130. Smith said he struck them first, took the items, and when he thought they were getting up, struck them again and slit their throats.

*State v. Smith*, 193 Ariz. 452, 455–56, 974 P.2d 431, 434–35 (1999).

At sentencing, the trial court found four aggravating factors and a number of mitigating circumstances but none sufficiently substantial to call for leniency. The court

sentenced Smith to death for the murders and to a term of imprisonment on the other counts. The Arizona Supreme Court affirmed. *Id*. The United States Supreme Court denied certiorari.

After unsuccessfully pursuing post-conviction relief ("PCR") in state court, Smith initiated the instant habeas proceedings.

## DISCUSSION

The court of appeals ordered this Court to reconsider habeas Claim 15, alleging ineffective assistance of counsel at sentencing, and "to address . . . whether reconsideration is warranted" as to habeas Claims 2, 3, and 4, alleging ineffective assistance of trial and appellate counsel and prosecutorial misconduct.[1] (Doc. 80.)

For claims not adjudicated on the merits in state court, federal review is generally not available when the claims have been denied pursuant to an independent and adequate state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). For such claims, "federal habeas review . . . is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id. Coleman* held that ineffective assistance of counsel in PCR proceedings does not establish cause for the procedural default of a claim. *Id.*

In *Martinez*, the Court established a "narrow exception" to the rule announced in *Coleman*. 566 U.S. at 9. Under *Martinez*, a petitioner may establish cause for the procedural default of an ineffective assistance of trial counsel claim "by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984)' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 566 U.S. at

---

[1] The remand order refers to Claims 7, 2, 4, and 5, as the claims were numbered on appeal.

14); *see Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney*, 813 F.3d at 798. The Ninth Circuit has clarified that "PCR counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective." *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012).

For claims that were adjudicated on the merits in state court, federal habeas review "is limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). In *Dickens,* however, the Ninth Circuit held that factual allegations not presented to a state court may render a claim unexhausted, and thereby subject to analysis under *Martinez*, if the new allegations "fundamentally alter" the claim presented to and considered by the state courts. *Dickens*, 740 F.3d at 1318. A claim has not been fairly presented in state court if new evidence fundamentally alters the legal claim already considered by the state court or places the case in a significantly different and stronger evidentiary posture than it was when the state court considered it. *Id.* at 1318–19.

The Ninth Circuit has held that in the context of a *Martinez* claim, *Pinholster* does not bar a petitioner from introducing new evidence to the district court. *Dickens*, 740 F.3d at 1321; *see Woods v. Sinclair*, 764 F.3d 1109, 1138 (9th Cir. 2014). "When a petitioner seeks to show 'cause' based on ineffective assistance of PCR counsel, he is not asserting a 'claim' for relief as that term is used in § 2254(e)(2)." *Dickens*, 740 F.3d at 1321. A petitioner may present evidence to demonstrate both cause and prejudice under *Martinez*. *Id.*

Smith has presented a series of exhibits in support of his claims. (Doc. 87, Ex's 1–29.) Respondents do not object to expanding the record to include the bulk of these documents, and the request will be granted in part.[2] (Doc. 88 at 89–91.) Smith also seeks

---

[2] Respondents object to the declaration of Russell Stetler, a "standard of care expert" who opines that counsel performed ineffectively at sentencing. (*See* Doc. 87-1, Ex. 1.) The Court will deny expansion of the record to include this declaration. The Court is familiar with the legal standards involved in evaluating ineffective assistance of counsel claims. "A federal court may determine that it does not require expert assistance 'to understand the legal analysis required by *Strickland*.'" *Heishman v. Ayers*, 621 F.3d 1030, 1042 (9th Cir. 2010) (quoting *Bonin v. Calderon,* 59 F.3d 815, 838 (9th Cir. 1995)).

an evidentiary hearing, to which Respondents object. (*Id.* at 89, 92.) That request will be rejected for the reasons discussed below.

**1.    *Martinez***

    A.    <u>Claim 15</u>

In Claim 15, Smith alleged that trial counsel performed ineffectively at sentencing by failing to present all reasonably available mitigation and failing to present the mitigation evidence that counsel did offer in a compelling and detailed manner. (Doc. 24 at 353.) The Court found Claim 15 procedurally barred because it was not presented in state court and Smith could not excuse its procedural default. (Doc. 64 at 23–24.) Respondents contend that Smith cannot show that trial counsel performed ineffectively at sentencing or that PCR counsel performed ineffectively by failing to raise Claim 15. (Doc. 88 at 23.) As set forth below, the Court agrees. Given the evidence counsel did present to the trial court, and given the court's findings at sentencing, Smith cannot show he was prejudiced by counsel's performance.

<u>Additional facts</u>

Defense counsel retained three experts to evaluate Smith and testify at trial. Dr. Thomas Gaughan, a psychiatrist, diagnosed Smith with major depression, ADHD, polysubstance dependence, personality disorder not otherwise specified (NOS), learning disorder NOS, mathematics disorder, and a history of head injuries.[3] (Doc. 88, App'x A, Ex. D at 14–16.) He noted that the results of a PET scan were normal and that the results of a neurological assessment were "within normal range."[4] (*Id.* 11.) Dr. Gaughan opined that Smith suffered from impaired impulse control and that his "mental state at the time of

---

    [3] Dr. Gaughan reported that Smith had "a significant history of multiple head injuries," two of which led to unconsciousness. (Doc. 88, App'x A, Ex. D at 5–6.)

    [4] Smith underwent a PET scan on April 3, 1996. (*See* Doc. 87-4, Ex. 20 at 2.) The results were normal, although another expert, Dr. Raine, believed the test was not properly administered. (*Id.*) An EEG, PET scan, and MRI were performed on June 13, 1997. (*Id.* at 6.) The results of these tests were within normal limits (*id.*), although "occasional left temporal minor sharp transients" were identified in the EEG. (*Id.*, Ex. 17 at 2.)

the murders was substantially impaired by his ADHD, personality disorder, major depression, and alcohol and possibly methamphetamine use." (*Id.* at 25–26.)

Dr. Adrian Raine, a neuropsychologist, detected "significant brain dysfunction which would contribute very significantly to impulsive, nonreflective violence." (*Id.*, Ex. F.) He testified that Smith's "prefrontal cortex is compromised or damaged or not functioning correctly." (RT 4/18/97 at 61.)

In his report, Dr. Raine listed several "lines of evidence . . . indicative of the fact that [Smith] probably suffered significant brain dysfunction which would contribute very significantly to impulsive, nonreflective violence." (Doc. 88, App'x A, Ex. F at 2.) This evidence included head injuries, memory loss, neurological test results, hyperactivity, the fact that Smith's mother smoked two packs of cigarettes a day when pregnant with Smith, and Smith's history of drug and alcohol abuse. (*Id.* at 2–3.)

Dr. Raine found a number of factors suggesting that Smith's "attack on the Tannehills was predominantly reactive in nature" or the result of "impulsive aggression." (*Id.* at 5.) Dr. Raine opined that while the initial stage of the robbery was largely proactive, Smith committed the murders impulsively, without reflection or premeditation. (*Id.*)

Dr. Raine also found evidence supporting the following mitigating factors: Smith's capacity to conform his conduct to the requirements of the law was impaired; Smith was under stress at the time of the offense; his aggression was impulsive and reactive; he was under the influence of drugs and alcohol at the time of the offense; he acknowledged his guilt and expressed remorse; he suffered from antisocial personality disorder; he was the victim of poor parenting and childhood abuse by his older brother; his parents suffered mental illnesses; his memory of the offense was impaired; he had close ties to his son; and he lacked a serious criminal record. (*Id.* at 8.)

Finally, Dr. Scott Sindelar, a neuropsychologist, performed an assessment of Smith. (*Id.*, Ex. L.) Dr. Sindelar found that overall Smith's neurological functioning was in the normal range. (*Id.* at 65.) He found Smith's intellectual functioning to be in the high average range, his verbal IQ to be average, his performance IQ high average, and his

achievement scores above average for reading but significantly below average for spelling and arithmetic.

Dr. Sindelar opined that "there was brain damage" to at least the "subcortical areas" of the brain resulting from blows to Smith's brain and his history of substance abuse. (*Id.* at 39.) Smith's brain injuries affected the part of the brain that regulates reactions and resulted in impulsivity. (*Id.* at 40–42, 53–57.)

Dr. Sindelar further found that Smith's "early and continued abuse of drugs potentially arrested his emotional and cognitive development" and his continued substance abuse caused him to "become increasingly disorganized and dysfunctional." (*Id.* at 5.) Dr. Sindelar explained that "[l]inks between alcohol abuse and violence have been recognized for years." (*Id.*) Dr. Sindelar also explained the damaging effects of methamphetamine use. (*Id.* at 5–11.)

Dr. Sindelar further noted that Smith's mother smoked heavily while she was pregnant with Smith. He concluded that "the evidence that we accumulated . . . is overwhelming that there were pre-natal influences on the brain. There were early problems that showed up in the school system, the drug use, the falls, the injuries, the blows to the head, . . . the ongoing substance abuse." *(Id.* at 82–83.)

In rebuttal, the State presented psychiatrist, Dr. Steven Pitt. (RT 4/22/97.) Dr. Pitt testified that in his opinion Smith did not suffer from memory loss, dissociative disorder, or frontal lobe damage. (*Id*. at 26–30.) He opined that Smith was able to reflect on his actions when he chose to. (*Id*. at 38.) Dr. Pitt diagnosed Smith with substance abuse and personality disorder NOS with antisocial features. (*Id*. at 46.)

Smith's experts did not testify at sentencing, but counsel attached their reports and portions of their trial testimony to his 54-page sentencing memorandum. (Doc. 88, App'x A.) Counsel argued that at the time of the killings Smith was impaired both by drug and alcohol intoxication and by mental and emotional disorders. (*Id*. at 31.) Counsel noted Smith's history of head injuries and substance abuse. (*Id*. at 35–40.)

During the sentencing phase of trial, counsel presented several mitigation witnesses, including Smith's father and various family friends. (RT 9/23/97 at 50–120.) These

witnesses testified that Smith was a loving father to his son; that he was caring towards his mother; that he was not a violent person; that he was victimized by the bullying of his older brother; and that his parents did not provide proper discipline. (*Id.*)

In his closing argument, Smith's counsel again asserted that Smith suffered from both mental and drug-induced impairments at the time of the murders. (*Id.* at 158.) Counsel discussed the diagnoses of ADHD and a personality disorder, Smith's brain injuries and the effects of methamphetamine use, and Smith's impulsivity. (*Id.* at 158–63.)

In sentencing Smith to death, the court found four aggravating factors: multiple killings, under A.R.S. § 13–703(F)(8); the crime was committed in expectation of pecuniary gain, A.R.S. § 13–703(F)(5); the crime was especially cruel as to Mrs. Tannehill, A.R.S. § 13–703(F)(6); and the victims were more than 70 years old, A.R.S. § 13–703(F)(9). (*See* Doc. 99, Ex. 1 at 2–4, Special Verdict 9/24/97.)

Smith offered one statutory mitigating circumstance, A.R.S. § 13–703(G)(1) ("The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."). (*Id.* at 7.) Smith alleged that drugs, alcohol, and mental and emotional disorders caused significant impairment at the time of the killings. (*Id.*)

The trial court found that Smith failed to prove "that on the night of these killings he was under the influence of drugs or alcohol. The evidence is, at best, contradictory, and [Smith] himself denied such use prior to the killings." (*Id.*) The court found, "[a]fter considering all of the other evidence," that "[Smith's] mental condition, whether caused by his child rearing or prolonged use of drugs, caused him to have a personality disorder." (*Id.* at 8.) However, based on a number of considerations, including Smith's "planning, execution and subsequent attempts to cover up his crime," the court concluded that Smith was not significantly impaired at the time of the killings. (*Id.*) The court did find that Smith "was impaired, but not significantly so. Therefore, [Smith] has established this as a non-statutory mitigating factor." (*Id.*)

Smith also offered 15 non-statutory mitigating circumstances. (*Id.* at 10–11.) The trial court found that Smith had proved the following circumstances: lack of prior felony or serious criminal history; love of his son; long-term addiction to drugs and alcohol; cooperation with law enforcement; behavioral and personality disorders and long-term effects of head injuries; newfound religious beliefs; dysfunctional family background; and controlled conduct in court hearings. (*Id.*)

The court found that the mitigating circumstances were not sufficiently substantial to call for leniency and sentenced Smith to death on the murder counts. (*Id.* at 13.)

Analysis

Smith alleges that trial counsel performed ineffectively at sentencing and that PCR counsel performed ineffectively by failing to raise a claim of ineffective assistance of counsel at sentencing. Specifically, with respect to the claim of sentencing-stage ineffective assistance of counsel, Smith asserts that counsel should have (1) investigated and presented evidence regarding Smith's fetal alcohol spectrum disorder (FASD); (2) presented objective evidence of brain damage through a quantitative electroencephalography (QEEG); and (3) presented testimony from Smith's mental health experts at sentencing. (Doc. 87 at 7–33.)

As set forth next, the Court finds that this ineffective assistance of trial counsel claim is meritless. Therefore, PCR counsel did not perform ineffectively in failing to raise the claim, and the claim remains procedurally defaulted and barred from federal review.

*(1)    FASD*

In support of the allegation that counsel performed ineffectively by failing to present evidence of FASD, Smith offers a declaration dated July 11, 2005, from Dr. Christopher Cunniff, a pediatrician and medical geneticist. (Doc. 87-2, Ex. 10.) Dr. Cunniff opines with a reasonable degree of medical certainty that Smith has "abnormal physical, intellectual and behavioral features caused by prenatal exposure to alcohol." (*Id.* at 3.)

Respondents contend that trial counsel were not ineffective in failing to present such a diagnosis because "evidence regarding Smith's mother's consumption of alcohol during her pregnancy and FASD and the effects of FASD were presented at trial, and further

evidence of FASD would not have changed . . . Smith's sentences." (Doc. 88 at 49.) The Court agrees.

Dr. Gaughan wrote in his report that Smith's mother "denies . . . use of alcohol during the pregnancy" but noted "that she is generally reported to be an alcoholic." (Doc. 88, App'x. A, Ex D at 5.) Drs. Raine and Sindelar reported that Smith's mother smoked two packs of cigarettes a day when she was pregnant with him. Dr. Raine testified that exposure to cigarette smoke disrupts fetal neural development, negatively impacts brain functioning, and predisposes the fetus to aggressive and violent behavior. (*Id.*, Ex. F at 2.)

Dr. Raine also testified that, "The fact that [Smith's] mother smoke and drank during pregnancy suggested to me also that during fetal development there was some impaired development of the brain of the Defendant." (RT 4/18/97 at 163.) He testified that fetal alcohol syndrome can cause impulsivity. (*Id.* at 165–69.) The trial judge then engaged in a colloquy with Dr. Raine about the effects of fetal exposure to alcohol. (*Id.* at 190–92.) Dr. Raine explained that fetal alcohol syndrome causes "cognitive impairment and brain dysfunction." (*Id.* at 191.)

Smith asserts that trial counsel should have provided his experts with additional information that would have allowed them to diagnose Smith with FASD but, as Respondents note, he offers nothing to suggest that the experts informed counsel that they required additional information. "Failure to provide a psychologist with facts about a defendant's family history ordinarily cannot support a claim of constitutionally ineffective assistance." *Turner v. Calderon*, 281 F.3d 851, 876–77 (9th Cir. 2002). "In the absence of a specific request, an attorney is not responsible for gathering background material that might be helpful to a psychiatrist evaluating his client." *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995). Smith offers no evidence that his experts requested additional information about his mother's alcohol consumption. Dr. Gaughan, for example, knew Smith's mother was an alcoholic; he could have asked for corroborating evidence if he had needed it.

Moreover, Smith has not established that he was prejudiced by counsel's failure to present additional evidence of FASD. This evidence would have been cumulative to the

evidence presented showing the effects of prenatal exposure to cigarettes and alcohol. The trial court took such evidence into account in concluding that Smith had proved as non-statutory mitigating circumstances his impairment at the time of the crimes and his "[b]ehavioral and personality disorders." (Doc. 99, Ex. 1 9–10.) Arguing that FASD caused Smith to act impulsively would not have altered the facts relied on by the trial court to find that Smith was not significantly impaired, including his "planning, execution and subsequent attempts to cover up the crimes." (*Id.* at 9.)

(2) *QEEG*

As noted, the trial court found that Smith had a personality disorder but that the disorder did not "significantly" impair his ability to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law under the statutory mitigating factor § 13-703(G)(1). (Doc. 99, Ex. 1 at 8.) In reaching that conclusion, the court cited several factors, including the "lack of objective showing of physical brain damage." (*Id.*) Smith contends that the results of a QEEG examination would have provided that "objective" evidence.[5]

Smith now offers the results of a QEEG performed in 2004. (Doc. 87-4, Ex. 17.) The results are explained in a declaration by psychologist Dr. John Johnstone. (*Id.*) The QEEG showed a left temporal lobe abnormality, which was also noted in prior EEGs. However, according to Dr. Johnstone, the QEEG revealed evidence that the prior EEG did not, namely a "temporal lobe dysfunction" related to "memory dysfunction" and "memory access disorders," which was caused by "chronic alcohol and substance abuse, extreme life stress, . . . neglect and abuse, . . . a history of multiple head injuries involving loss of consciousness and a developmental history of learning disabilities." (*Id.* at 5.)

While the QEEG offers new evidence that the prior EEG results did not reveal, the substance of that evidence is cumulative to the evidence before the trial court at sentencing.

---

[5] Respondents speculate that the results of the QEEG might not have been admissible and criticize its validity as a diagnostic tool. (Doc. 88 at 53–54.) For the purposes of this order the Court assumes that the results were legitimate and admissible.

Through the testimony of Drs. Gaughan, Raine, and Sindelar, the court was aware of Smith's purported memory problems, his history of substance abuse, his life stresses, his head injuries, and his learning disabilities. In addition, both Dr. Raine and Dr. Sindelar testified that Smith suffered from brain damage and brain dysfunction. Further evidence of brain damage would have been cumulative. *See Bible v. Ryan*, 571 F.3d 860, 871–72 (2009) ("[A]t sentencing his counsel introduced evidence of Bible's potential brain damage from drug and alcohol abuse, and so any further evidence of this speculative brain damage would have been cumulative.").

In addition, the absence of an "objective showing of physical brain damage" was not the sole basis for the court's conclusion that Smith's mental capacity was impaired but not significantly impaired at the time of the killings. The court also considered Smith's planning, execution, and subsequent attempts to cover up his crimes, his lack of prior criminal history, his previous ability to control his temper, and his normal IQ. Therefore, even if the QEEG met the trial court's definition of objective evidence of physical brain damage, there is not a reasonable probability that the court's analysis of the mitigating evidence would have changed such that the court would have imposed a life sentence.

### (3)     Live witnesses

Smith alleges that counsel performed ineffectively by failing to present the testimony of their expert witnesses during the sentencing phase of trial. In support of this allegation, Smith offers declarations from lead trial counsel who indicates that "because the *Christensen* defense prevented his experts from testifying to the ultimate question— how all of Smith's deficits affected his state of mind at the time of the crime—he should have called them to testify on this issue at sentencing."[6] (Doc. 87-1, Ex. 2 at ¶ 5; *see id.*, Ex. 3 at ¶ 3.) They also offer a declaration by Dr. James Rosenberg, a forensic psychiatrist who was asked to evaluate Smith for the guilt phase of trial, who opines that the

---

[6] Under *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (1981), a defendant may present evidence that he has a character trait for acting reflexively, rather than reflectively, for the purpose of negating a finding of premeditation. The *Christensen* rule is limited, however, in that an expert cannot testify as to whether the defendant was acting impulsively at the time of the offense. *Id.* at 35–36, 628 P.2d at 583–84.

neuropsychological testing conducted on Smith "was too limited and inadequate on the question of his frontal lobe functioning." (*Id.*, Ex. 9 at ¶ 6.)

Smith cannot show he was prejudiced by counsel's failure to present expert testimony at sentencing because evidence of his state of mind at the time of the killings was placed before the court. In their reports, Drs. Gaughan and Raine both concluded that Smith was acting impulsively at the time of the crimes. Dr. Gaughan stated that Smith's illnesses caused him to be impulsive and non-reflexive, especially when faced with increased stress and fear, and that Smith's mental state at the time of the offense was substantially impaired. (Doc. 88, App'x A, Ex. D at 14–17.) Dr. Raine opined that "reconstructing the defendant's state of mind at the time of the attack, the data leads me to believe that the defendant was acting impulsively and without reflection, and that the defendant did not premeditate the homicides." (*Id.*, Ex. F at 5.) There was not a reasonable probability that the court would have changed its sentencing analysis if evidence of the "ultimate question" had been presented through live testimony rather than through the experts' reports.

Likewise, Dr. Rosenberg's opinion that the neuropsychological testing was inadequate does not support a finding of prejudice. The only additional information revealed through such testing are the results of the QEEG, which showed a "temporal lobe dysfunction" associated with memory problems. Again, because the causes and effects of that dysfunction were before the court at sentencing, the QEEG results are cumulative and would not have affected the court's analysis of the evidence of Smith's impairment at the time of the killings.

Dr. Rosenberg also opines that trial counsel should have done more to impeach the testimony of Dr. Pitt. (Doc. 87-1, Ex. 9 at ¶¶ 8–10.) The record shows, however, that counsel's cross-examination of Dr. Pitt was effective. Dr. Pitt acknowledged that smoking and alcohol use by a pregnant mother can lead to permanent brain damage in the fetus; that poor parenting can affect personality and behavior; and that the use of central nervous stimulants at an early age can cause long-term brain injury. (RT 4/22/97 at 135–36.) Dr. Pitt acknowledged that Smith's mother and other family members were alcoholics and that

some of Smith's family members suffered from mental health issues. (*Id*. at 135, 138–41.) Dr. Pitt acknowledged that there was a significant scar on Smith's forehead indicative of a head injury. (*Id*. at 144.) He agreed that Smith acted impulsively in moving from one town to another without finances or a job, and in getting married after knowing his new wife for only two weeks. (*Id*. at 152, 156–57.) Dr. Pitt also testified that Smith told him that he "shut[s] off" during a fight and that a "rage" takes over—"it's the lights on but nobody's home." (*Id*. at 158–59.)

Counsel's cross-examination supported the defense theme that brain dysfunction caused Smith to act impulsively and without reflection when he committed the murders. There is not a reasonable probability that additional, sentencing-stage testimony challenging Dr. Pitt's conclusions would have resulted in a different sentence.

In sum, the evidence concerning FASD and the QEEG results "would have barely altered the sentencing profile presented to the sentencing judge." *Strickland*, 466 U.S. at 699–700. Smith was not prejudiced by trial counsel's performance at sentencing. PCR counsel in turn did not perform ineffectively in failing to raise the claim. *Sexton*, 679 F.3d at 1157. Claim 15 remains procedurally defaulted and barred from federal review.

### B.    Claims 2, 3, and 4

In Claim 2, Smith alleged that trial counsel performed ineffectively by allowing Smith to be interviewed by James Jarrett, a crime scene reconstructionist who testified at trial. (Doc. 24 at 98.) In Claim 4, Smith alleged that trial counsel performed ineffectively by failing to object to the late notice of Dr. Pitt, the State's mental health expert. (*Id*. at 227.) He also alleged that appellate counsel performed ineffectively by failing to raise a claim challenging the untimely disclosure of Dr. Pitt. (*Id*.)

In Claim 3, Smith raised various allegations of prosecutorial misconduct.[7] (*Id*. at 118.) He also asserted that trial and appellate counsel performed ineffectively by failing to object to the misconduct and failing to raise the issue on direct appeal. (*Id*.)

---

[7] Because this aspect of Claim 3 does not allege ineffective assistance of trial counsel, it is not subject to analysis under *Martinez*. *See Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013). Claim

In his habeas petition, Smith argued that he fairly presented Claims 2, 3, and 4 in state court by raising them in his PCR petition and his petition for review. (Doc. 24 at 104, 124, 234.) This Court agreed, reviewing and denying the claims on the merits. (*See* Doc. 70 at 28–51.)

Smith now asserts that new evidence fundamentally alters the claims, rendering them unexhausted and procedurally defaulted under *Dickens* and *Martinez*. (*See* Doc. 87 at 59, 72–74, and 70.) The new evidence to which Smith refers consists of declarations by trial counsel and members of the defense team, appellate counsel, and PCR counsel. (*Id.*, Ex's 2, 3, 4, 6, 25, 27, 28.)

The declarations provide some additional evidentiary support for Smith's allegations of ineffective assistance of counsel but they fall far short of altering the claims under the standard set forth in *Dickens*. *See Vasquez v. Hillery*, 474 U.S. 254, 260 (1986) (explaining that a petitioner may add factual materials supportive of those already in the record without fundamentally altering his claim and rendering it unexhausted); *see also Weaver v. Thompson*, 197 F.3d 359, 364–65 (9th Cir. 1999).

The petitioner in *Dickens* raised only general allegations in state court that "sentencing counsel did not effectively evaluate whether Dickens 'suffer[ed] from any medical or mental impairment.'" 740 F.3d at 1319. In his federal habeas petition, however, he "changed his claim to include extensive factual allegations suggesting Dickens suffered from FAS [Fetal Alcohol Syndrome] and organic brain damage." *Id.* at 1317.

The court found that Dickens's "new evidence creates a mitigation case that bears little resemblance to the naked *Strickland* claim raised before the state courts." *Id.* at 1319. It further noted that the claim urged in state court only "generally alleged" that counsel did not effectively evaluate whether Dickens suffered from a medical or mental impairment and that specific conditions like FAS and organic brain damage placed the claim in a "significantly different" and "substantially improved" evidentiary posture. *Id.*

---

3's allegations of prosecutorial misconduct remain defaulted and barred from federal review.

In Smith's case, the declarations that constitute the new evidence consist of the declarants' explanations for why they now feel their performance was deficient. For example, PCR counsel attests that she should have further investigated the claims regarding the crime scene investigator and Dr. Pitt. (Doc. 87-6, Ex. 25, ¶ 12.) Trial counsel provided a declaration stating the reasons he should not have called the crime scene investigator as a witness. (Doc. 87-1, Ex. 2 at ¶¶ 7–12.) Appellate counsel in his declaration states that the prosecutor in the case was "very tough" and "would approach the line." (*Id.*, Ex. 6 at ¶ 10; *see* Doc. 87-6, Ex. 27 at ¶ 3.) Appellate counsel also states that he improperly winnowed his arguments without taking into account that this was a capital case and every argument should have been raised on appeal. (Doc. 87-6, Ex. 27 at ¶¶ 2, 7.)

None of this information fundamentally alters Claims 2, 3, and 4. The new information adds nothing to the factual grounds or legal arguments on which the ineffective assistance of counsel claims were based. For example, with respect to Claim 2, trial counsel now states that Jarrett's "testimony highlighted the violence in the crime" and "Mr. Jarrett had very damaging things to say that the prosecution would not have discovered otherwise." (Doc. 87-1, Ex. 2 at ¶ 8.) This is the same argument the Court considered and rejected in denying Claim 2 on the merits. (*See* Doc. 70 at 30–31.) With respect to Claim 4, the only new evidence Smith offers is PCR counsel's statement that she failed to investigate the issue. (Doc. 87-6, Ex. 25, ¶ 12; *see* Doc. 87 at 59.) Finally, beyond the fact that the prosecutor was "very tough" (Doc. 87-1, Ex. 6 at ¶ 10), Smith offers no new evidence in support of Claim 3.

In sum, the claims are the same ones the Court already denied on the merits. The claims themselves, while arguably somewhat stronger based on counsel's mea culpas, are not altered or placed in a different evidentiary posture.

Claims 2, 3, and 4 have not been fundamentally altered and rendered unexhausted by the new evidence produced during these habeas proceedings. Accordingly, the Court will not reconsider its denial of Claims 2, 3, and 4.

////

////

**2.     *McKinney***

On December 29, 2015, the Court of Appeals issued its en banc opinion in *McKinney*. The court held the Arizona Supreme Court, for a period of more than 15 years, violated *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982), in its capital sentencing analysis by requiring a defendant to show a causal nexus between his proffered mitigating evidence and the crime.[8] *McKinney*, 813 F.3d at 802. The Arizona Supreme Court affirmed Smith's death sentence in 1999, during the period when, according to *McKinney*, the Arizona Supreme Court applied this unconstitutional causal-nexus test. *See Smith*, 193 Ariz. at 452, 974 P.2d at 431.

In his amended habeas petition, Smith raised a claim alleging that the state courts employed a causal-nexus test to his mitigating evidence in violation of *Eddings*. (Doc. 24 at 356.) This Court denied the claim as procedurally barred. (Doc. 64 at 27.)

Smith argues that this claim was exhausted by the Arizona Supreme Court's independent review of his sentence. (Doc. 97 at 1–2.) Respondents disagree. (Doc. 99.) Notwithstanding its procedural status, the Court finds the claim is meritless.

Additional facts

As discussed above, the trial court found four aggravating factors: multiple murders, pecuniary gain, the crime was especially cruel as to Mrs. Tannehill, and the victims were more than 70 years old. (Doc. 99, Ex. 1 at 2–4.)

Smith offered one statutory mitigating circumstance, A.R.S. § 13–703(G)(1), alleging that drugs, alcohol, and mental and emotional disorders caused significant impairment at the time of the offenses. (*Id.*)

The trial court found that Smith failed to prove he was under the influence of drugs or alcohol at the time of the crimes. (*Id.*) The court found that Smith had a personality disorder caused by his upbringing or chronic drug use. (*Id.* at 8.) Based on Smith's "planning, execution and subsequent attempts to cover up his crime," the court concluded

---

[8] From *State v. Wallace*, 160 Ariz. 424, 773 P.2d 983 (1989), to *State v. Anderson*, 210 Ariz. 327, 111 P.3d 369 (2005). *See McKinney*, 813 F.3d at 815–17.

that Smith was not significantly impaired at the time of the killings. (*Id.*) Instead, the court found that Smith "was impaired, but not significantly so" and determined that this was a non-statutory mitigating factor. (*Id*.)

The court considered each nonstatutory mitigating circumstance offered by Smith and found that the following had been proved: lack of prior felony or serious criminal history; love of his son; long-term addiction to drugs and alcohol; cooperation with law enforcement; behavioral and personality disorders and long-term effects of head injuries; newfound religious beliefs; dysfunctional family background; and controlled conduct in court hearings. (*Id* at 10–11.)

The trial court then summarized its conclusions:

> The Court has reviewed each aggravating factor and each mitigating factor. The question before the Court is whether there are mitigating factors sufficient to call for leniency. This is not a process of comparing the numbers, but a process of discerning the value to be placed upon each of these factors. Admittedly, this is not an exact science, it is complex and to a certain extent value driven.
> . . .
> I have tried to analyze in the greatest detail possible the pros and cons of the mitigating and aggravating factors. It is my conclusion that the mitigating factors are not substantial enough to call for leniency in light of the overwhelming aggravating factors.

(*Id.* at 12–13.)

On direct appeal, the Arizona Supreme Court began its independent review by focusing on the statutory mitigating circumstance:

> We agree with the trial court that the evidence is insufficient to establish the existence of the (G)(1) mitigating factor. First, we do not believe that Smith was impaired by drugs or alcohol at the time of the murders. His own statements to Detective Rice were that he was not intoxicated before the murders, but he had been taking methamphetamine after the murders. The evidence does not support a finding that Smith was under the influence of drugs or alcohol during the murders.
>
> Second, we agree with the trial court that Smith likely has a personality disorder, but this did not cause significant impairment. "Character or personality disorders alone are generally not sufficient to find

that defendant was significantly impaired." *State v. Murray,* 184 Ariz. 9, 42, 906 P.2d 542, 575 (1995). Smith was both able to appreciate the wrongfulness of his actions and had the ability to conform his conduct to the requirements of the law.

Smith did not prove he suffered any physical brain damage. Although he presented testimony of head injuries, tests showed he had normal neurological function and a normal IQ.

Smith planned the murders and robbery. Evidence shows that he then covered up his actions in these crimes. For example, he removed the license plate from his motor home and threw away the bloody weapons and clothing. The evidence shows that Smith appreciated the wrongfulness of his conduct.

That Smith can conform his conduct to the requirements of the law is evidenced by his lack of prior serious convictions. He has one misdemeanor conviction for DUI. In addition, witnesses testified that Smith could control his temper and walk away from an altercation. Smith has not proved this mitigator.

*Smith*, 193 Ariz. at 462, 974 P.2d at 441.

The court next agreed with the trial court's assessment of the non-statutory mitigating circumstances. *Id.* at 463, 974 P.2d at 442. The court then concluded: "We have independently reviewed the trial court's findings of aggravation and mitigation and agree with those findings. Upon independent weighing, we conclude that the mitigation, considered individually and collectively, is not sufficiently substantial to warrant leniency." *Id.*

Analysis

In *Greenway v. Ryan*, 866 F.3d 1094 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 2625, and *Apelt v. Ryan*, 878 F.3d 800 (9th Cir. 2017), *cert. denied*, --- S. Ct. ----, 2019 WL 1172280, the Ninth Circuit offered additional guidance for interpreting its decision in *McKinney*. This guidance demonstrates that Smith is not entitled to relief.

In *Greenway*, the court explained:

We said in *McKinney* that the Arizona courts had "consistently" applied the causal-nexus test. 813 F.3d at 803. We did not say, however, that Arizona had always applied it. Notably, in listing the cases in which the causal-nexus

test was erroneously applied by the state courts, the *McKinney* majority opinion did not include Greenway's case. *McKinney, Id.* at 815–16, 824–26. And in *McKinney*, our holding resolved only the "precise question" whether the state court had applied the causal-nexus test in that specific case. *Id.* at 804. We therefore must examine the state court decisions in Greenway's case to determine whether they took into account all mitigating factors.

*Greenway*, 866 F.3d at 1095–96; *see Martinez v. Ryan*, 926 F.3d 1215, 1234 (9th Cir. 2019). Likewise, the *McKinney* court did not list Smith's case as one where causal-nexus error occurred.

The Arizona Supreme Court's opinion in *Smith*, like its opinion in *Greenway*, "on its face . . . does not expressly exclude any mitigation evidence or claim on the ground that it lacked causal relationship to the commission of the crime." *Id.* at 1097. Like the trial court, the state supreme court considered all of the proffered mitigating circumstances. *Smith*, 193 Ariz. at 461–62, 974 P.2d at 440–41. The court "did not reject any mitigating factor, as a matter of law, on the theory that it was not related to the commission of the crime." *Greenway*, 866 F.3d at 1097. The court did not use any of the language found to be problematic in *McKinney*'s discussion of cases where the Arizona Supreme Court improperly applied a causal-nexus test to mitigating evidence. *McKinney*, 813 F.3d at 813–17, 824–26; *see Greenway*, 866 F.3d at 1097–98. None of the formulations enumerated in *McKinney* are present in the state court's decision in Smith's case. *McKinney*, 813 F.3d at 813–17, 824–26; *see Greenway*, 866 F.3d at 1098.

In *Apelt*, the court rejected the petitioner's claim of a causal-nexus violation, explaining that:

> None of the critical factors in *McKinney* are present in this case. In particular: (1) the trial court did not state a factual conclusion that any of Apelt's proffered mitigation failed to affect his conduct; (2) the Arizona Supreme Court did not state a factual conclusion that any of Apelt's proffered mitigation would have influenced him not to commit the crime; and (3) the Arizona Supreme Court did not cite *Ross* or *Wallace* when reviewing Apelt's mitigation evidence.[9]

---

[9] *State v. Ross*, 180 Ariz. 598, 886 P.2d 1354 (1994), and *State v. Wallace*, 160 Ariz. 424, 773 P.2d 983, 986 (1989).

878 F.3d at 839–40. The same factors apply to the trial court's and the Arizona Supreme Court's analysis of Smith's mitigating evidence. *Greenway* and *Apelt* establish that Smith is incorrect when he argues that "[t]he failure of the Arizona Supreme Court to explicitly restate the causal-nexus test in Smith's opinion does not matter." (Doc. 97 at 25.)

Smith contends that the trial court imposed a causal-nexus requirement on his "proffered nonstatutory mitigation of drug use and impairment prior to the crime." (Doc. 97 at 19.) This is incorrect. The court simply found that Smith "was not under the influence of drugs at the time of the killings." (Doc. 99, Ex. 1 at 10.)

Finally, even if the state courts did apply an unconstitutional causal-nexus test, "there could have been no prejudice because the aggravating factors overwhelmingly outweighed all the evidence that [Smith] asserted as mitigating." *Greenway*, 866 F.3d at 1100; *see Apelt*, 878 F.3d at 840. Like Greenway, Smith committed multiple first-degree murders, for pecuniary gain, in an especially cruel manner.

The trial court accurately described the aggravating factors in Smith's case as "overwhelming." (Doc. 99, Ex. 1 at 13.) The multiple homicides aggravator carries "extraordinary weight" in the sentencing calculus. *State v. Hampton*, 213 Ariz. 167, 185,140 P.3d 950, 968 (2006). The pecuniary gain aggravator was also weighty, as the trial court explained:

> The Court notes that the Defendant went to the victims' trailer with the intent to rob them, armed with a gun and large knife. The Defendant's size, relative to the victims, made the outcome a foregone conclusion. If he had wanted to rob them without killing them, he could have easily.
>
> . . . Defendant's own version of the facts shows that he . . . rummaged around the victims' trailer, stealing their property and, only after that, delivered what he thought to be the death blows and cutting the victims' throats.

(Doc. 99, Ex. 1 at 3.)

In addition, the victims were both more than 70 years old. Finally, Elaine's murder was especially cruel—"there were defensive wounds on [her] forearms showing that she

was alive while being attacked and had the opportunity to not only fear for her own life, but also that of her disabled husband." (*Id.* at 5.)

Even if the state courts had improperly excluded any mitigating circumstance on causation grounds—which they did not—the strength of the aggravating factors would have outweighed the totality of any of the mitigating circumstances Smith has proffered. *See Greenway*, 866 F.3d at 1100; *Apelt*, 878 F.3d at 840; *Martinez*, 926 F.3d at 1236–37.

Finally, because the Court has found there is no *Eddings* error, Smith's Motion for a Stay will be denied.

### 3. Evidentiary development

The Court has granted, with the exception of Exhibit 1, Smith's request to expand the record with the exhibits attached to his supplemental *Martinez* brief. Smith also seeks an evidentiary hearing. The Court, having reviewed the entire record, including the new evidence presented by Smith in his supplemental brief, concludes that an evidentiary hearing is not warranted. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); Rule 8(a) of the Rules Governing Section 2254 Cases. Whether Smith's allegations of ineffective assistance of trial counsel are "substantial" under *Martinez* is resolvable on the record. *Cf. Dickens*, 740 F.3d at 1321 (explaining that "a district court may take evidence to the extent necessary to determine whether the petitioner's claim of ineffective assistance of trial counsel is substantial under *Martinez*").

### CERTIFICATE OF APPEALABILITY

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, an applicant cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court finds that reasonable jurists could debate its resolution of remanded Claim 15.

## CONCLUSION

**IT IS ORDERED** that Claim 15 is **DENIED** as procedurally barred.

**IT IS FURTHER ORDERED** that Smith's request to reconsider Claims 2, 3, and 4 is **DENIED.**

**IT IS FURTHER ORDERED** that Smith's request to expand the record with the materials attached to his supplemental *Martinez* brief is **GRANTED** with the exception of Exhibit 1. His request for an evidentiary hearing is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **GRANTED** as to Claim 15.

**IT IS FURTHER ORDERED** that Smith's Motion to Stay Proceedings (Doc. 106) is **DENIED**.

Dated this 29th day of July, 2019.

Susan R. Bolton
United States District Judge